**Gerald B. MURPHY, a minor, by and through his parents and next of friends, Girlie A. Murphy and William C. Murphy, Appellant**

v.

**UNITED STATES of America, et al.**

**No. 80–1552.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1980.

Decided May 18, 1981.

MacKinnon, Circuit Judge, concurred in part and dissented in part and filed opinion.

Louis Fireison, Bethesda, Md., for appellant.

Robert C. Seldon, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C.

Ruff, U. S. Atty., John A. Terry and Robert E. Eaton, Jr., Asst. U. S. Attys., Washington, D. C., were on the brief for appellee, United States of America.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D. C., were on the brief for appellee, District of Columbia. Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., also entered an appearance for appellee, District of Columbia.

Before ROBINSON, Chief Judge, and MacKINNON and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion filed by Circuit Judge MacKINNON, concurring in part and dissenting in part.

WALD, Circuit Judge:

## INTRODUCTION

On November 28, 1976, during the afternoon dormitory count, a gang of inmates[1] brutally attacked, beat, and stabbed 19-year-old Gerald Murphy as he lay resting on his bed in his room at Lorton Youth Center I.[2] The attack left Murphy permanently partially paralyzed; he will never again walk unaided.[3] His parents brought this suit for damages on his behalf against the United States and the District of Columbia.[4] The complaint alleged two bases of liability against each defendant. The first count alleged that Murphy's injuries were the reasonably foreseeable consequence of the defendants' employees' negligence. The second count sought relief on the theory that the institutional conditions which allegedly facilitated the attack constituted violations of Murphy's fifth amendment right to due process and eighth amendment right against cruel and unusual punishment. At the close of appellant's case, the trial court directed a verdict in favor of both defendants on the constitutional theory of liability. The court contemporaneously granted the United States' motion for a directed verdict on the negligence count, but denied the District's motion for similar relief. At the conclusion of the trial, the jury returned a verdict against the District on the negligence count in the amount of $161,000. The court then granted the District's motion for a judgment *non obstante veredicto* ("n.o.v."), and directed a verdict in favor of the District on the negligence count, thereby denying to appellant as a matter of law relief on all counts.

Appellant now appeals from three of the trial court's rulings: its decision to direct a verdict in favor of the United States on the negligence count; its decision to direct a verdict in favor of the District on the constitutional count; and its grant of the judgment n. o. v. in favor of the District on the negligence count. We affirm the first two of these rulings, but reverse the third. We find that sufficient evidence did exist to go to the jury on the question of the District's negligence in allowing the attack to take place. However, because we find that a directed verdict was warranted with respect to one of the theories of liability presented

1. Gerald Murphy was sentenced to an indeterminate term of up to four years in the Youth Center (to be followed by two years of "supervision" in the community) under the Youth Corrections Act ("YCA" or "FYCA"), 18 U.S.C. § 5010(b), following his plea of guilty in the District of Columbia Superior Court to the offenses of burglary, 22 D.C.Code § 1801, and armed robbery, 22 D.C.Code § 2901. Trial Transcript of May 7, 1979 ("Tr. 5/7/79") at 56–57.

2. Four to six youths, of whom only two were later identified, participated in the attack. Tr. 5/7/79 at 57–58.

3. Tr. 5/8/79 at 336 (testimony of Dr. Silby).

4. Though Murphy's parents are technically appellants in this case, both parties have referred to "plaintiff" and "appellant" (singular form) throughout this proceeding. For the sake of consistency we will do the same. The court also dismissed claims against several individual defendants before trial. Tr. 5/7/79 at 5. The appellant does not contest these dismissals on appeal.

to the jury on the negligence issue, we must remand the case for retrial rather than merely ordering reinstatement of the jury verdict. *See* p. 646 *infra.*

## I. THE STANDARD OF REVIEW

The criteria for granting a motion for a directed verdict and for a judgment n. o. v. are identical.[5] In each case, the motion should not be granted unless the evidence, together with all the inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree on the verdict.

*Vander Zee v. Karabatsos,* 589 F.2d 723, 726 (D.C.Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979). When considering such a motion, all evidence must be "viewed in the light most favorable to the [non-moving party.]" *Alden v. Providence Hospital,* 382 F.2d 163, 165 (D.C.Cir. 1967). *See also Princemont Construction Corp. v. Smith,* 433 F.2d 1217, 1220 (D.C.Cir. 1970). Indeed, in any case "where fairminded people might differ as to the conclusion appropriate," *id.,* the court must submit the question to the jury. Thus, the question before us is whether reasonable persons could have concluded on the basis of the evidence presented at the trial that either the District or federal defendants were negligently responsible for the attack that resulted in plaintiff's injuries, or that the District had violated Murphy's constitutional rights.

---

**5.** *Vander Zee v. Karabatsos,* 589 F.2d 723, 726 (D.C.Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979) ("[T]he standard for awarding a judgment n. o. v. is the same as that applied when ruling on a motion for a directed verdict."); *Lester v. Dunn,* 475 F.2d 983, 985 (D.C.Cir.1973) ("Judgment notwithstanding the verdict is nothing more than a directed verdict granted after, rather than before, the jury has had an opportunity to bring in a verdict.").

**6.** Although the argument was made at trial, Tr. 5/9/79 at 436, the appellant does not raise on appeal the question of the Federal Government's liability for the negligence of Lorton Youth Center's employees. Without specific evidence of day-to-day federal control over the youth facility, not presented in this case, that claim is foreclosed by this court's decision in *Cannon v. United States,* 645 F.2d 1128, (D.C.

## II. THE CASE AGAINST THE UNITED STATES

The appellant sued the United States for damages under the Federal Tort Claims Act ("Act" or "FTCA"), 28 U.S.C. §§ 2671 *et seq.,* which renders the United States liable for injuries "caused by the negligent or wrongful act or omission of any employee of the [United States] Government[.]" 28 U.S.C. § 1346(b). The appellant argues that the Attorney General and the Director of the Bureau of Prisons were negligent in two respects: first, in failing to ensure that Murphy was committed to a "reasonably safe" institution, and second, in failing to adequately supervise Murphy once he was placed in Lorton Reformatory.[6] We find both arguments unpersuasive.

### A. *Murphy's Placement in Lorton Youth Center*

The appellant argues that the section of the Youth Corrections Act ("YCA" or "FYCA") under which he was sentenced, 18 U.S.C. § 5010(b),[7] and 24 D.C.Code § 425 [8] impose upon the Attorney General a statutory obligation to place offenders such as Murphy in "an appropriate correctional facility," Brief for the Appellant at 12, and that the Attorney General violated this obligation by "perfunctorily" assigning Murphy to Lorton Youth Center. *Id.* at 15. Lorton, the appellant contends, was inappropriate

---

Cir.1981) (holding no FTCA liability exists for negligence of Lorton Reformatory employees).

**7.** 18 U.S.C. § 5010(b) provides in pertinent part that:

> If the court shall find that a convicted person is a youth offender, and the offense is punishable by imprisonment ... the court may ... sentence the youth offender to the custody of the Attorney General for treatment and supervision. pursuant to this chapter until discharged[.]

**8.** This statute commits "[a]ll prisoners convicted in the District of Columbia for any offense ... for their terms of imprisonment ... to the custody of the Attorney General of the United States" and gives him the power to "designate [their] ... places of confinement."

because its inmates were not "reasonably secure from harm"—one "could reasonably expect that an armed and dangerous gang of inmates would . . . be permitted to enter his room and brutally attack him." *Id.* at 12, 14.

▮ The appellant first argues that under 18 U.S.C. §§ 5010–15 of the FYCA, the Attorney General was obligated to evaluate Murphy and commit him to the federal youth center best suited to his needs.[9] This duty, he contends, was violated by Murphy's "perfunctory" commitment to Lorton without a formal evaluation of his needs and the institution's ability to meet them. However, we agree with the trial judge: "There is no [such] statutory responsibility [.]" Tr. 5/9/79 at 439. Congress amended the YCA in 1967 to grant District officials comprehensive control over the "maintenance, treatment, rehabilitation [and] supervision" of District of Columbia Code offenders such as Murphy by authorizing the District to construct or contract for facilities in which to house them, and granting it complete authority over those offenders sentenced to such local facilities.[10] Although the judge still technically assigns District of Columbia Code offenders to the custody of the Attorney General when sentencing them pursuant to 18 U.S.C. § 5010(b),[11] and the Attorney General in turn has the legal authority to designate as their place of confinement any appropriate facility,[12] local or otherwise, 18 U.S.C. § 5025 makes clear that Congress envisioned that the Attorney General would commit them to Lorton in the absence of unusual circumstances.[13] In practice, the sentencing judge recommends commitment of District of Columbia Code offenders to Lorton Youth Center, or asks the Bureau of Prisons to investigate alternative placements. In Murphy's case, no request for alternative placement was made and the sentencing judge committed him directly to Lorton Youth Center.[14] This

9. *See* Brief for the Appellant at 14.

10. 18 U.S.C. § 5025(c) states:

All youth offenders committed to institutions of the District of Columbia shall be under the supervision of the Commissioner of the District of Columbia, and he shall provide for their maintenance, treatment, rehabilitation, supervision, conditional release, and discharge in conformity with the objectives of this chapter.

The commentary accompanying 18 U.S.C. § 5025 states that Pub.L. 90–226 (the 1967 amendment)

. . . struck out [the] provision that, whenever undergoing treatment, committed youth offenders were subject to all the provisions of this chapter as though convicted of offenses not applicable exclusively to the District[.] The legislative reports accompanying the bill stated its purpose as to "transfer[] the authority to provide for the treatment, rehabilitation, and conditional release of Federal youth offenders who are in institutions of the District of Columbia" from Federal to District officials. *See* S.Rep.No.912, 90th Cong., 1st Sess. 24 (1967); H.R.Rep.No.387, 90th Cong., 1st Sess. 31 (1967). *See also* pp. 11–13 *infra.*

11. *See* note 7 *supra.*

12. *Id. See also* note 8 *supra* (powers of Attorney General under 24 D.C.Code § 425).

13. Section 5025(a) provides:

The Commissioner of the District of Columbia is authorized to provide facilities and personnel for the treatment and rehabilitation of youth offenders convicted of violations of any law of the United States applicable exclusively to the District of Columbia or to contract with the Director of the Bureau of Prisons for their treatment and rehabilitation, the cost of which may be paid from the appropriation for the District of Columbia.

14. Norman Carlson, the Director of the United States Bureau of Prisons, described how this statute was implemented in Murphy's case:

I have reviewed relevant records in the possession of the Bureau of Prisons relating to the sentencing and confinement of Gerald B. Murphy, Bureau of Prisons Register Number 23376–175. These records reflect that Mr. Murphy was sentenced on May 27, 1976 in the Superior Court for the District of Columbia, to two concurrent periods of imprisonment of six years for Armed Robbery and Second Degree Burglary in violation of 22 D.C.Code §§ 1801, 2901.

These records indicate that in due course Mr. Murphy was committed to the Lorton facility under the jurisdiction of the District of Columbia Department of Corrections for service of his sentence. As Mr. Murphy was not sentenced in the U. S. District Court for violation of federal laws and as his sentencing court made no recommendation that he be placed in a federal facility for service of his sentence, no request was made to the

commitment was consistent with the plain thrust of the statutory scheme of placing District youth offenders under the jurisdiction of the District of Columbia Department of Corrections unless the sentencing court requests otherwise.[15]

But second, even if the Attorney General retains a general obligation under this statutory scheme to assign Murphy to an "appropriate" institution,[16] appellant failed to present sufficient evidence of the Attorney General's breach of this duty to warrant submission to the jury. Violence is unfortunately endemic to American prisons; the appellant could not and does not argue that the mere fact that some inmate assaults occur at Lorton Youth Center makes it an "inappropriate" institutional placement for Murphy.[17] Rather, he argues that the institution is "inappropriate" because the rate of violence is so high as to be "unreasonable."[18] While in some cases the raw number of assaults may be sufficient evidence of unreasonableness, in this case the number of assaults that occurred in the Youth Center and in Dormitory # 3 where Murphy lived in the year of his attack was not so high as to strike this court as *per se* unreasonable.[19] Moreover, the appellant adduced no other evidence at trial tending to prove unreasonableness, e. g., that these numbers were outside the range of violence normally associated with this type of penal institution,[20] or that any subset of prisoners suffered from an unusual risk of attack.[21]

~ Bureau of Prisons for a designation of his institution of confinement. Staff of the Bureau of Prisons had absolutely no knowledge of or involvement in the decision to confine Mr. Murphy at the Lorton facility. The Bureau of Prisons generally has no involvement in such cases.

Bureau of Prisons records further reflect that on December 14, 1976 the District of Columbia Department of Corrections requested that the Bureau of Prisons accept Mr. Murphy for service of his sentence in a federal institution on a reimbursable basis. This request was accepted by the Bureau of Prisons on December 16, 1976, and Mr. Murphy was transferred to the Medical Center for Federal Prisoners, Springfield, Missouri, on December 28, 1976. He is presently incarcerated at that facility.

Record on Appeal ("R.") 29 (Exhibit A).

15. *See generally* Report of the President's Commission on Crime in the District of Columbia 452 (1966) (study which inspired the bill).

16. One district court has held that the federal government retains a residual obligation to District of Columbia Code offenders sentenced under the FYCA to see that they are placed in institutions "used only for treatment of committed youth offenders." *See United States v. Alsbrook*, 336 F.Supp. 973 (D.D.C.1971). Although it is also conceivable that obligations may arise from District offenders' legal status as "commit[ted] . . . to the custody of the Attorney General" under 24 D.C.Code § 425, this case does not require us to decide what, if anything, these obligations entail. The only responsibility allegedly shirked by the federal government in this case was its alleged duty to protect Murphy from the negligent caretaking of his immediate Youth Center custodians and that duty seems to have been clearly transferred to the District by 18 U.S.C. § 5025.

17. The appellant's expert witness, Mr. Miller, testified on cross-examination that he did not know of a penal institution in the United States in which inmate assaults did not occur. Tr. 5/8/79 at 274–75.

18. *See* Brief for the Appellant at 10–15 (appellant should have been placed in institution where he was "reasonably secure from harm"). The "Government is not an insurer of the safety of a prisoner," *Jones v. United States*, 534 F.2d 53, 54 (5th Cir.), *cert. denied*, 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 586 (1976); however, prison officials owe prisoners the "common law duty" to "exercise reasonable care in the protection and safekeeping of the prisoner." *Gaither v. District of Columbia*, 333 A.2d 57, 60 (D.C.1975).

19. Twenty inmate assaults were reported as occurring at Lorton Youth Center I during the 1976 calendar year, R. 25 (Attachment VIII); six of them (27%) took place in Dormitory # 3 which houses approximately 100 youths. *Id.*

20. The only other statistic revealed at trial was the number of assaults which occurred at the Massachusetts Correctional Institute at Norfolk during the three-month period in which the appellant's expert witness was in charge of the facility. Tr. 5/8/79 at 273 (testimony of E. Miller). However, these numbers offer no basis for a meaningful comparison inasmuch as Norfolk was a larger facility, housing adult offenders and structured differently from Lorton Youth Center in many respects. *See id.* at 270–73.

21. *Cf. Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980) (constitutional violation to fail to take reasonable precautions to prevent pervasive pattern of inmate assaults).

Moreover, the appellant himself stipulated that he had not feared for his physical safety prior to the attack;[22] there was therefore insufficient evidence of an excessive level of inmate assaults for a jury to conclude that "terror reign[ed]" in the institution or even that there was a pervasive risk of harm to inmates like Murphy.[23] No reasonable juror could have concluded from this barren record that the rate of assaults at Lorton was so excessive that the Attorney General's placement of Murphy there violated any statutory obligation to place him in an appropriate institution. The question was therefore properly withheld from the jury.

B. *The Attorney General's Duty to Supervise Murphy at Lorton*

 Appellant's second theory of federal liability, i. e., that the Attorney General or Director had a duty to supervise his care after commitment to Lorton Youth Center, likewise fails because that alleged duty too no longer exists. It was eliminated by the 1967 amendments to the FYCA. According to appellant, the Director had an obligation under the FYCA to "supervise youth offenders subsequent to their commitment and to insure that the objectives of the FYCA are met with regard to each youth offender."[24] Brief for the Appellant at 15. However, as we pointed out earlier, Congress in 1967 explicitly transferred responsibility for "supervision" of District Youth Center offenders, including "maintenance,

treatment [and] rehabilitation" from federal to local authorities. It is hard to see how Congress could have made its intent to transfer day-to-day supervision over District of Columbia Code offenders in Lorton Youth Center any clearer.[25]

The appellant also claims that the Director neglected his statutory duty under 18 U.S.C. § 5016 to periodically reexamine Murphy and report on his progress for purposes of granting a parole or transfer. Even a superficial reading of 18 U.S.C. § 5025, however, makes clear that the District now supervises the conditional release and discharge, as well as the treatment and rehabilitation, of District youth offenders committed to its facilities.[26] In fact, one of the stated purposes of the 1967 amendment was to "transfer" authority from the "U. S. Bureau of Prisons and the Youth Corrections Division of the U. S. Board of Parole to the Commissioner of the District of Columbia" in order to grant "local authorities . . . continuing jurisdiction over such offenders, permitting a continuity of treatment which should bring about more effective results." S.Rep.No.912, 90th Cong., 1st Sess. 24 (1967). The report notes that it changes the then-existing law under which

> an offender sentenced under the provisions of the Federal Youth Corrections Act and committed to a District of Columbia institution is under the supervision of District authorities while in the institution but under the supervision of the Youth Corrections Division of the

---

**22.** Tr. 5/7/79 at 58.

**23.** *See Withers v. Levine, supra,* 615 F.2d at 161; *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir. 1973).

**24.** Appellant points to the Director's duty to provide "treatment" for YCA offenders generally in specifically designated facilities in 18 U.S.C. § 5011, as well as the duty to make reports and recommendations as to the treatment of each offender in 18 U.S.C. § 5014.

**25.** *But see* note 16 *supra* (possibility exists of residual obligations).

**26.** *See* 18 U.S.C. § 5025(c). We note also another weakness in this theory of liability. The only possible connection between the failure to reexamine and report on Murphy and the at-

tack lies in the remote chance that had the Director conducted the studies, Murphy would have been either paroled or transferred before the time of the attack. However, the appellant made no attempt to show that this occurrence was likely. In fact, the appellant presented evidence tending to prove that up to the time of the attack, Murphy had been progressing well at school, and was participating in a vocational training program, so that no factors indicating a need for a transfer were present. Tr. 5/9/79 at 497–503. Parole was also an unlikely possibility. Murphy had been committed to the facility only six months prior to the assault; his counselor testified that he had told Murphy just prior to the assault that he would not give him a favorable parole recommendation. *Id.* at 503.

U.S. Board of Parole for purposes of conditional release.

*Id. See also* H.R.Rep.No.387, 90th Cong., 1st Sess. 31, 39 (1967). District parole authorities, rather than the United States Parole Commission, are therefore responsible for making and evaluating the progress reports on which the conditional release and discharge decisions are made.[27]

The 1967 amendment thus eliminates the Federal Government's responsibility for those very duties whose breach, according to the appellants, constituted negligence. The trial judge correctly concluded that "[a]ny attempt to read the District of Columbia Code in specific provisions with respect to the youth facilities here in the same fashion you read it with respect to the Youth Corrections Act nationally is incorrect.... There is no statutory responsibility[.]" Tr. 5/9/79 at 439. His direction of a verdict in favor of the Federal Government on this or any theory of liability argued below was therefore not in error.

### III. THE CASE AGAINST THE DISTRICT OF COLUMBIA.

#### A. *The Constitutional Count*

Though the appellant's complaint alleged several violations of fifth and eighth amendment rights, the only argument he presses on this appeal is that the District violated his eighth amendment right to be free of cruel and unusual punishment. Specifically, appellant argues that placement in a dormitory at Lorton Youth Center "in which violent prisoner assaults frequently occurred," and the District's subsequent failure to take reasonable precautions to protect him from such assaults, violated his constitutional right to be free from an unreasonable risk of assault. Brief for the Appellant With Respect to Appellee D.C. at 20.

The Supreme Court has laid out the standard of proof necessary to establish an eighth amendment violation. The Court has held that "deliberate indifference" of

prison authorities to a prisoner's "serious" medical needs may constitute such "wanton infliction of unnecessary pain" as to be " 'repugnant to the conscience of mankind,' " or incompatible with " 'the evolving standards of decency that mark the progress of a maturing society.' " *Estelle v. Gamble*, 429 U.S. 97, 102–05, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). The Court took pains in that opinion to distinguish between "negligen[ce]" or "an inadvertent failure," which does not invoke constitutional protections, and "deliberate indifference," which does. *Id.* at 105–06, 97 S.Ct. at 291–92. The district court here correctly concluded, and the appellant does not now challenge, that

> [t]here is no indication ... from any of the testimony here that the police [sic] officers deliberately did anything or willfully violated any of their responsibilities to protect Murphy[.]

Tr. 5/9/79 at 428.

■ However, as appellant correctly points out, this conclusion does not end the constitutional inquiry because the existence of "deliberate indifference" can be inferred from evidence that assaults are sufficiently pervasive to reasonably apprise prison officials of the need for protective measures. Under these circumstances the failure to institute protective measures can rise to the level of a constitutional violation. While a prisoner has no right to demand the level of protection necessary to render an institution assault-free (he is only entitled to "reasonable protection" from assaults, *see* note 18 *supra*), commitment to an institution where "terror reigns," or even where the "risk of ... assault [is] a serious problem of substantial dimensions," may violate the eighth amendment. *See Jones v. Diamond*, 636 F.2d 1364 at 1373 (5th Cir. 1981); *Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980). But to prevail under such a constitutional theory, the prisoner must show that

---

**27.** It appears from this record that the District authorities in fact prepared such reports on

Murphy and his institutional progress. Tr. 5/9/79 at 497–503 (testimony of Mr. Hilliard).

violence and sexual assaults occur ... with sufficient frequency that the ... prisoners ... are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures.

*Id.* Not all prisoners need be subject to this fear. "It is enough that an identifiable group of prisoners do, if the complainant is a member of that group." *Id.*[28]

■ However, we must agree with the district court that no such showing was made here. The sole evidence proffered, again, was the raw number of assaults (twenty) that occurred in Lorton Youth Center I (population 344), and the number (six) in Dormitory # 3 (population 100) where Murphy was housed during the 1976 calendar year, numbers we have already found insufficient in this case to prove unreasonableness. *See* p. 642 *supra.* Furthermore, the appellant made no attempt to show that the rate of assaults in this facility exceeded the norm for like institutions or that one identifiable group of inmates was especially susceptible to attack. *See* notes 19 & 20 *supra.* Particularly in view of the appellant's stipulation that he did not fear for his safety prior to the attack,[29] we cannot find in this record any support for appellant's contention that so escalated a level of violence existed that the prison officials must have been "deliberately indifferent" to the prisoner's need for reasonable protec-

tive measures.[30] Hence, we uphold the trial court in its refusal to submit the constitutional count to the jury.

### B. *The Negligence Count*

The appellant's last argument was that the Lorton Youth Center staff's negligence in three areas proximately caused his injury, thereby rendering the District liable for that injury. He alleged: 1) the staff failed to follow applicable count regulations in ways that facilitated the movement of at least one of Murphy's attackers into his dormitory wing;[31] 2) the staff failed to properly perform and/or record the required room and inmate searches and tool inventories so that no adequate system of tool control existed to prevent inmates' easy access to weapons such as those which may have been used in Murphy's assault; and 3) the staff released one of Murphy's attackers from the Center's Adjustment Unit, despite a lengthy record of verbal threats of violence and disciplinary infractions, without taking special security precautions to ensure the protection of other inmates, and failed to recommit him following a more recent disciplinary infraction. After the trial court initially denied the District's motion for a directed verdict on all three theories, the jury returned a verdict in favor of the plaintiff. The trial court then granted a judgment n. o. v. against the appellant because

---

**28.** In *Withers*, a defect in the classification and cell-mate assignment procedures placed young, slightly built men in especial fear of attack. 615 F.2d at 161. *See generally* Comment, *Actionability of Negligence Under Section 1983 and the Eighth Amendment*, 127 U.Pa.L.Rev. 533, 560–61 (1978) (denial of fundamental essentials to prisoners an Eighth Amendment violation).

**29.** Tr. 5/7/79 at 58.

**30.** The appellant similarly proffered no evidence that the assaults fell into a pattern indicating a pervasive defect in prison procedures or a deliberate failure on the part of prison officials to exercise reasonable care to prevent prisoners from inflicting harm upon one another. Mr. Miller, appellant's expert, testified on several occasions that the classification, search, tool inventory and count procedures

laid down in institutional regulations and manuals were adequate; he contended only that the correctional officers deviated from them in practice. Tr. 5/8/79 at 256–57, 286, 309, 313. *Cf. Jones v. Diamond, supra* (eighth amendment violation found when no classification system existed, trustees in total charge of security for large portions of the day); *Holt v. Sarver*, 442 F.2d 304 (8th Cir. 1971) (same).

**31.** *See* Tr. 5/8/79 at 254 (testimony of E. Miller). Only two of Murphy's assailants were identified, Vaughn Pugh and Jones. Tr. 5/7/79 at 84–5. It was stipulated at trial that Pugh lived in a wing of Dormitory # 3 other than that in which Murphy was housed. Tr. 5/9/79 at 405. Jones lived on the same wing. *Id.* at 402.

[p]laintiff failed to present evidence from which the jury could reasonably have found that the conduct of Defendant's employees was a proximate cause of Plaintiff's injuries .... [I]mmediately after an inmate count is completed, the inmates are free to move around Youth Center I and mingle in the recreation areas of their respective wings. Given that fact, the failure to prevent all movement of inmates during the count cannot be said to have proximately caused Plaintiff's injuries. Plaintiff's other allegations of negligence were not supported by the evidence and thus also cannot sustain the jury's verdict.

*Murphy v. United States*, Civ. No. 78–251 (D.D.C. Apr. 30, 1980) (order granting judgment n. o. v.); R. 92 at 2.

■ We disagree with the court's decision to grant the judgment n. o. v. on two of the three theories of liability. Though we would not characterize the appellant's case on any of the three theories of negligence as strong, he did present expert testimony as to the applicable standard of care and the staff's alleged deviation from that standard in two of the three alleged areas of negligence.[32] We conclude that the jury could have found that expert evidence along with the testimony of Lorton correctional officers sufficient from which to infer that the staff's negligence proximately caused Murphy's injury on these two theories of liability. However, we agree with the trial judge and the appellee that the appellant presented insufficient evidence to allow the jury to consider the third theory

of liability, that relating to the classification of Vaughn Pugh. Because we cannot determine on which theory of liability the jury relied when finding in favor of the appellant, leaving open the possibility that it may have relied on the impermissible one, the case must be remanded for retrial. *See Wilmington Star Mining Co. v. Fulton*, 205 U.S. 60, 79, 27 S.Ct. 412, 419, 51 L.Ed. 708 (1907); *Glass v. Seaboard Coast Line Railroad Co.*, 457 F.2d 1387, 1389 (5th Cir. 1972).

1. Deviations from the Count Regulations

Prison officials count inmates several times each day to ensure that no one has escaped.[33] During such counts, inmates are required to remain stationary in certain areas of the prison, usually their cells, until all inmates are accounted for.[34] Murphy's assault occurred sometime during the mid-afternoon count. His theory of liability is that the staff prematurely released inmates from their wings into the porch and communal areas before the institutional count had been cleared, and one of the four guards assigned to guard the dormitory was consequently on the porch with several inmates rather than on patrol inside the dormitory[35] at the time of the attack. Both actions, allegedly in violation of the applicable regulations, permitted at least one of his attackers to leave his wing and cross over to Murphy's dormitory to perpetrate the assault. Such unauthorized cross-overs, a recognized security hazard,[36] were prohibit-

---

**32.** *Cf. Hughes v. District of Columbia*, No. 79–246 (D.C. Jan. 13, 1981) (affirming directed verdict against plaintiff in suit for damages from inmate assault at Lorton because of lack of expert testimony regarding "negligent deviation from the demonstrated acceptable standard" of care); *Matthews v. District of Columbia*, 387 A.2d 731 (D.C.1978) (affirming judgment n. o. v. against plaintiff in suit for damages from inmate assault at Lorton because no expert testimony that "flexibility in placement of correctional officers in accordance with inmate population movements" deviated from reasonable standard of care).

**33.** See Tr. 5/8/79 at 243 (testimony of E. Miller).

**34.** *Id.* at 247–48.

**35.** The officer on the porch, Officer Scott, had been assigned to count, and therefore presumably guard, the dormitory wing in which Murphy was housed. Tr. 5/7/79 at 104 (testimony of Officer Scott). The porch patrol was thus maintained at the expense of surveillance of the inmates on Murphy's wing.

**36.** *See* Tr. 5/8/79 at 242–43, 251–52, 254 (testimony of E. Miller); Tr. 5/7/79 at 117 (testimony of Officer Scott); *id.* at 61 (testimony of Maj. Decatur).

ed by institutional regulations.[37]

No one disputed the fact that on November 28, 1976, the staff allowed the residents of Dormitory # 3 off their wings following the completion of the dormitory count,[38] without waiting for the institutional count to clear.[39] Considerable dispute did exist at trial, however, as to whether this procedure violated the applicable standard of care. The inmate handbook containing the Youth Center's official regulations said merely that "[a]ll residents must stay *in their rooms* until the count is cleared by the Dormitory Officer." (Emphasis in original.)[40] The appellant's expert witness testified that this meant, or should have meant, that inmates were to remain in their rooms until the institutional count cleared.[41] The officers on duty testified variously that the expert's interpretation of the regulation was correct and that the regulation meant only that residents were to stay in their rooms until the dormitory count cleared; after that they could go into the dormito-

ry's communal rooms or on the porch[42] until the institutional count cleared.

There was also contradictory testimony over whether the officer who went out on the porch after calling in the count violated his duty to stay inside the dormitory and ensure that inmates also stayed on their wings. According to the appellant's expert, each officer should have been patrolling one wing of the dormitory to ensure that no inmate left his wing during the count.[43] The Youth Center officers testified, on the other hand, that placing an officer on the porch was the appropriate security technique for ensuring that youths, allowed in the common areas of the dormitory following completion of the dormitory count, did not leave the dormitory prematurely.[44]

There was thus no question, and the trial judge did not conclude otherwise, that sufficient evidence existed to go to the jury on the issue of whether it was a negligent deviation from the prevailing standard of care[45] to conduct the count as the staff at

37. R. 54 (Exhibit XVI) (Superintendent's Order 4000.12A). This regulation forbids unauthorized inmate visits to wings other than the one to which they are assigned *at all times*, not merely during counts, "[i]n order to better control and supervise inmate traffic[.]" *Id.*

38. Four guards, divided into teams of two, count each dormitory at Lorton Youth Center I. Each team is responsible for two wings of the dormitory. A team counts one wing at a time. The backup officer stations himself at the head of the wing to make sure inmates do not change rooms during the count. The second officer walks along the wing, counting each inmate. When he finishes, the team moves to the second wing for which it is responsible. After the inmates in this wing are counted, the counting officer goes to the dormitory's control room where he and the other counting officer report their totals to the institutional control tower. If the figures are correct (as expected), the dormitory count is then over. Tr. 5/7/79 at 73–74 (testimony of Maj. Decatur).

39. The institutional count clears only after all dormitories account for all residents. *See id.* at 71.

40. Resident Handbook: Youth Center One, Lorton, Virginia at 4; R. 54 at 10 (Exhibit XIII).

41. Tr. 5/8/79 at 247–50 (testimony of E. Miller).

42. *See* Tr. 5/9/79 at 526 (testimony of Maj. Decatur) (inmates allowed off wings once dormitory count clear); Tr. 5/7/79 at 93 (testimony of Maj. Decatur) (inmates to stay on wing until institutional count clears); *id.* at 118–20 (testimony of Officer Scott) (inmates to remain in rooms until institutional count clears); Tr. 5/8/79 at 152–59 (testimony of Officer Johnson) (inmates allowed to mingle in TV rooms and porch after dormitory count clears).

43. Tr. 5/8/79 at 252–54, 306–09 (testimony of E. Miller).

44. Tr. 5/7/79 at 125 (testimony of Officer Scott); Tr. 5/9/79 at 526–27 (testimony of Maj. Decatur).

45. The dissent argues that even if the officers breached their duty of care in this instance, the judge was authorized to rule against appellant as a matter of law on "the *noncausal* question of whether the 'defendant should be legally responsible.'" Diss. op. at 654 (emphasis added). It contends that no liability should result because "the procedures for obtaining an accurate count were not directed at protecting plaintiff or other inmates from inmate assaults." *Id.* at 652. This argument, however, is based on a mistaken factual assumption: that unauthorized cross-overs were prohibited only during count times, and only for the purpose of obtaining an accurate count. In fact,

Lorton admittedly did on the day of Murphy's assault. The judge granted the judgment n. o. v. because he found as a matter of law that the failure to prevent movement of inmates off the wings during the count could not be considered a proximate cause of Murphy's injury given the fact that a few minutes later, when the count was completed, the inmates were legitimately allowed to move around in communal areas of the dormitory and outside in the Youth Center compound. In other words, he appeared to conclude that because the attack could as easily have taken place later when movement was freer, any negligence in allowing out of wing movement before the count procedures were completed merely accelerated the timing of, rather than caused, the attack.

However, we do not find this reasoning satisfactory as a justification for overturning the jury's finding of negligent liability. There was testimony that the placement of both the officers [46] and inmates [47] was different during count and non-count periods. Thus, even if Murphy's assailants could have illegitimately entered into his wing during "free time," a jury could nonetheless have inferred that the attack would have been more difficult to perpetrate when Murphy was not as likely to be in his room and when dormitory guards were not occupied with the count. The possibility that an attack might have taken place later under different circumstances does not excuse officers' irregular actions during the count which may have created an unreasonable danger of attack during that period of time and therefore proximately caused the attack.[48]

unauthorized cross-overs were deemed a threat to the security of the institution and prohibited at all times, see R. 54 (Exhibit XVI) (Superintendent's Order 4000.12A); Tr. 5/7/79 at 117 (testimony of Officer Scott); Tr. 5/9/79 at 420 (concession of government's lawyer); Tr. 5/8/79 at 245–46 (testimony of E. Miller). There was a difference, however, between count and non-count periods in the routine mandated to effectuate enforcement of the cross-over regulation; the count procedure included the posting of extra guards at strategic points in the dormitory to control cross-overs while the normal complement of guards was engaged in the counting process. Tr. 5/9/79 at 418 (comments of the court) ("[I]t is uncontradicted ... [that] the purpose of the backup man during the count is to make sure no one switches over. . . . [b]ecause as the officer who is making the count goes by, his head cannot swivel; he cannot watch everything. . . . The backup man stands there and watches so that nobody slips out when one of the officers goes by or nobody slips in or nobody slips anywhere."). See also Tr. 5/7/79 at 122 (testimony of Officer Scott); note 38 supra. Thus, evidence of variances from the mandated count procedure which resulted in facilitation of cross-overs, see note 35; see also text at notes 33–44, was in fact evidence of the institution's violation of its general duty to use reasonable care to protect inmates from assaults by other inmates. Tr. 5/9/79 at 421 (comments of court) ("if you get a man from another wing who has been identified as being the assailant of Murphy, ... an inference can be drawn ... that the correctional staff was ... not discharging responsibility to see that that never happens"). Because it thus can be said "that it was in accordance with the usual experience of

mankind that an inmate would be assaulted . . . as the result of the officer being on the porch . . . and that said result should have been foreseen and apprehended," Diss. op. at 6, the non-causal question of whether the defendant should be legally responsible is not at issue in this case, and proximate cause was a jury issue. W. Prosser, Law of Torts 244 (4th ed. 1971).

46. During a count, officers are stationed in fixed positions which leave two wings virtually unguarded for several minutes. The backup officer on each wing being counted is supposed to be stationed close enough to or in the hall between the wing being counted and the wing just counted to be able to see and prevent any movement between the wings. However, his attention is necessarily primarily focused on the wing being counted. See Tr. 5/7/79 at 122 (testimony of Officer Scott).

47. Target inmates, who must remain in their rooms during a count, are not as likely to be there during other hours when work or recreational activities are scheduled. For instance, all residents ordinarily leave their rooms for dinner immediately following the clearing of the afternoon institutional count. See Tr. 5/9/79 at 526–27 (testimony of Maj. Decatur).

48. "Proximate cause" has been defined by District of Columbia courts as:

a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to be foreseen in light of the circumstances.

Spar v. Obwoya, 369 A.2d 173, 178 (D.C.1977). That an injury was directly caused by an inten-

## 2. Tool Control

Murphy's attackers stabbed him 16 times and beat him; a doctor testified that the beating may have been administered with a blunt instrument. Tr. 5/8/79 at 333. There is no question but that the inmates should not have had access to such weapons; there is also no question that prison inmates typically strive and often manage to find, steal, or create many such weapons.[49] Appellant argued that the officials at Lorton Youth Center I did not use their best efforts to prevent inmates from possessing weapons, but in fact violated both their own regulations and the prevailing standard of care by failing to maintain adequate tool control, search, and shakedown procedures. The resultant access to weapons, he claimed, proximately caused his injuries.[50]

The Youth Center had detailed regulations governing tool access, tool return, and tool inventories to prevent inmates from utilizing tools as weapons.[51] The appellant's expert testified that these regulations were adequate;[52] however, he also testified that as far as he could tell from the correctional officers' preceding testimony, the staff had failed to follow them. He repeatedly stressed the need for,[53] and in this institution apparent lack of, a tool inventory as the linchpin of an adequate tool control system. Appellant had requested in his interrogatories the records of all tools listed as missing during the years 1973–78. However, the District responded that it had no such records.[54] At trial, it was argued that this response meant only that the information did not exist in the form requested;[55]

tional tort or crime of a third person does not preclude a finding of proximate causation of the first actor if "the danger of an intervening negligent or criminal act should have reasonably been anticipated and protected against[.]" *St. Paul Fire & Marine Ins. Co. v. James G. Davis Constr. Corp.*, 350 A.2d 751, 752 (D.C. 1976); *see also Spar v. Obwoya, supra*, 369 A.2d at 778. Further, an act need not be the sole cause of an injury for it to be considered a proximate cause; it need only be a substantial factor in bringing that injury about. *Washington v. District of Columbia*, No. 13095, slip op. at 16 (D.C. Apr. 6, 1981) (reversal of directed verdict against plaintiff who claimed fall down stairs and injury accrued therefrom caused by District's failure to maintain handrail by staircase despite weaknesses in evidence that presence of handrail would have prevented fall because " '[if] there was a handrail, you would have a chance to grab something to steady yourself but without a handrail you don't even have that last chance.' "); *Lacy v. District of Columbia*, No. 12858 (D.C. Dec. 5, 1980) (upholding substantial factor as proximate cause).

**49.** Mr. Miller outlined various measures that could be used to reduce access to weapons, *see* Tr. 5/8/79 at 244–45; he never claimed that these measures would render an institution weapon-free. Subsequent to the attack on Murphy, the Youth Center upgraded its own tool control procedures by increasing daily shakedowns of the housing units. R. 56 at 14 (answers to second set of interrogatories).

**50.** The dissent contends that appellant did not raise this argument on appeal. We disagree. Appellant argued generally that sufficient evidence existed to go to the jury on all of his

negligence theories, which included the tool control failures, and in his brief contended that he had "alleged numerous grounds of negligence and established substantial evidence of acts or omissions ... [which] would be sufficient for a reasonable juror's finding of negligence and proximate causation." Brief for Appellant With Respect to Appellee D.C. at 19. Moreover, he specifically pointed out the testimony in which "Dr. Miller emphasized the inadequacies of the District of Columbia's tool control and inventory procedures." *Id.* at 8. In view of the considerable evidence adduced at trial on the tool control issue, as well as the appeal's focus on the entirety of the evidence as the basis for overturning the judgment n. o. v., we have no difficulty finding that appellant preserved the tool control issues on appeal.

**51.** *See* R. 54 (Exhibit No. XII).

**52.** Tr. 5/8/79 at 313 (testimony of E. Miller).

**53.** *Id.* Mr. Miller termed adequate tool control "essential," adding that the American Correctional Association "state[s] that an institution without proper tool control is risking disaster in the administration of the institution." *Id.* at 250. He further opined that "[t]here is no way you can have tool control without an inventory," *id.* at 251, and that the failure to have an inventory "possibly lead[s], probably lead[s], to weapons being possessed by inmates," *id.* at 259, and attacks on inmates, *id.* at 244–45.

**54.** *Id.* at 314; *see also* R. 56 at 12 (answers to second set of interrogatories).

**55.** Tr. 5/8/79 at 316 (comments of trial judge).

one officer testified that lists of missing tools had been kept for these years but had since been destroyed as obsolete.[56] Two other officers denied all knowledge of a tool inventory or any other record of tools extant at or missing from the institution.[57] The court refused to issue a subpoena for any existing tool inventories, in whatever form, at trial.[58] Hence there was evidence before the jury that no inventory existed and no definitive proof that it did. The absence of such an inventory might well have been relied upon by the jury as evidence of the lack of an adequate tool control program, a program necessary, according to appellant's expert, to reasonably insure inmates' safety.

The expert witness also testified that regular searches and shakedowns of the institution were essential for adequate tool control.[59] He specifically stated that for a search to be effective, inmates must be searched along with their rooms.[60] However, one correctional officer testified that when he conducted searches at Lorton Youth Center I, he searched only rooms, and allowed the inmate to stand in the hall where it was possible for him to pass contraband to his fellow inmates.[61] One correctional officer testified that he did not remember conducting the number of room searches and shakedowns required by the Center's regulations.[62]

The attack on Murphy was perpetrated by armed inmates; without weapons of some sort, his attackers could not have inflicted the multiple stab wounds. Evidence existed from which a reasonable jury could have concluded that Lorton Youth Center's tool control program, designed to keep weapons out of inmates' hands *precisely to forestall this type of attack*, had been ignored by several guards in Murphy's dormitory. Where evidence of the failure to adhere to a reasonable standard of care exists, and the "injury which has in fact occurred is precisely the sort of thing that proper care on the part of the defendant would be intended to prevent," not only is the existence of proximate cause a jury question, but "the court can . . . allow a certain liberality to the jury in drawing its conclusion." W. Prosser, Law of Torts 243 (4th ed. 1971).

### 3. The Classification of Pugh

The third and final allegation of negligence resulted from the Center's decision to release one of Murphy's attackers, Vaughn Pugh, from the Center's Adjustment Unit.[63] Appellant argued that Pugh's

---

**56.** Tr. 5/7/79 at 85–86 (testimony of Maj. Decatur).

**57.** Officer Johnson did not remember seeing any regulations regarding tool control, nor did he remember receiving any instructions on the implementation of such regulations. Tr. 5/8/79 at 158–59, 163. Officer Scott testified to a similar lack of knowledge. Tr. 5/7/79 at 125–26.

**58.** Tr. 5/8/79 at 384.

**59.** *See id.* at 245 ("So, consequently, you want frequent shakedowns, both of the entire institution and of each particular part of it to insure that inmates do not have in their possession any item of danger."); *see also* Tr. 5/9/79 at 513–16 (testimony of Maj. Decatur) (detailing importance of searches and shakedowns to security of institution).

**60.** Tr. 5/8/79 at 256.

**61.** Tr. 5/7/79 at 108–09, 137 (testimony of Officer Scott) ("Q: And isn't it a fact that most of the times you generally have them go out of their room, and you go in and just search their rooms? Isn't that correct? A: True."); Tr. 5/9/79 at 516 (testimony of Maj. Decatur) (patting down inmate necessary "part of the [search] procedure").

**62.** For instance, although the applicable regulations call for two rooms to be searched each day, Officer Scott could not remember searching any rooms the day of Murphy's attack, Tr. 5/7/79 at 109–10, and admitted that he "probably" would have remembered it if he had. *Id.* at 110. The shakedown and search logs requested in appellant's interrogatories were never produced, allegedly because they had been destroyed. *Id.* at 80–81 (testimony of Maj. Decatur).

**63.** The Adjustment Unit is a solitary confinement unit reserved for inmates who need "close supervision." Tr. 5/8/79 at 225 (testimony of Mr. Hilliard). Pugh was sent there because he had collected ten disciplinary violations. All were for verbal abuse of or insubordination to correctional officers. *Id.* at 173–79,

release subjected him to an unreasonable risk of attack. However, we agree with the trial judge's conclusion that this theory of negligence was not "supported by the evidence and thus also cannot sustain the jury's verdict." *Murphy v. United States,* Civ. No. 78–251 (D.D.C. Apr. 30, 1980) (order granting judgment n. o. v.); R. 92 at 2.

In contrast to his testimony regarding appellant's other allegations of negligence, appellant's expert did not state that anything about the decision to mainstream Pugh violated a "penological concept." [64] The process by which the decision was made was admittedly adequate; [65] the decision itself was not "off the wall." [66] The strongest term of criticism Mr. Miller was willing to utter against the decision was "inappropriate." [67] As the District's counsel made clear on cross-examination, the disagreement between Mr. Miller and the officer who had made the decision was one of professional judgment.[68]

We are unwilling to hold under the circumstances here that evidence of a difference in judgment between experts as to the assaultive possibilities of an inmate constitutes evidence of negligence. When a decision requiring a difficult prediction of future behavior is shown to have been made in accordance with proper procedural safeguards and is substantively within a range

of reasonableness, the burden of proving negligence cannot be said to have been met.[69] Appellant presented no evidence to support his claim that the officials negligently classified Pugh aside from the testimony of Mr. Miller. Pugh's disciplinary reports showed a pattern of verbal, not physical abuse; there was no evidence that he had assaulted an inmate prior to the attack on Murphy. Pugh's release from the Adjustment Unit followed 90 days of, and behavioral improvement during, treatment; release was conditioned on his participation in a special counseling program.[70] In short, appellant presented no evidence that Lorton Youth Center's handling of Pugh was unreasonable, and the trial court could properly direct a verdict against Murphy on that theory of liability.

## CONCLUSION

A party moving for a directed verdict or judgment n. o. v. bears a very heavy burden. He must prove that no reasonable person, after viewing all evidence in the light most favorable to the other side, could decide for that other side. The appellees successfully carried that burden with respect to most of appellant's allegations of liability. However, we must agree with the district judge's initial, rather than his post-

---

188. None were for assaults on or even threats made to other inmates. *Id.* He was cited for an additional violation, again involving verbal abuse of and insubordination to a guard in the four months between his release from the Adjustment Unit and the date of the attack on Murphy. *Id.* at 228–29.

64. Tr. 5/8/79 at 287 (testimony of E. Miller).

65. *Id.* at 281.

66. *Id.* at 287.

67. *Id.* at 284–88. Mr. Miller refused to use the term "negligent," and was noticeably reluctant to endorse the term "unreasonable" as a description of the decision.

Q: . . . Are you saying it was an unreasonable judgment?
A: (No response)
Q: Do you understand that? Do you understand what I mean by "unreasonable"?
A: If you could define the term in the way in which you mean it in this particular instance?

*Id.* at 284. The court then ruled this line of questioning improper.

68. *Id.* at 278–80.

69. Under District of Columbia law, to make out a claim of negligence against jailers for injuries accrued during the course of imprisonment, a plaintiff "must establish by competent evidence a standard of care; that the defendant violated that standard; and that such violation proximately caused injury to the plaintiff." *Hughes v. District of Columbia, supra,* slip op. at 8. Because "[t]he question of whether prison officials acted reasonably to secure the safety of an inmate is not within the realm of the everyday experiences of a lay person," in the District, "expert testimony or supporting evidence is necessary to establish that standard." *Id.,* slip op. at 10. *See also Matthews v. District of Columbia, supra,* 387 A.2d at 734–35.

70. Tr. 5/9/79 at 452–54 (testimony of E. Bolger).

verdict, evaluation of two of the three theories underlying his claim against the District on negligence grounds: "You just barely made it under the wire." Tr. 5/9/79 at 429. The case should have been submitted to the jury for resolution of the disputed factual questions determinative of the District's liability under those theories. Because the original jury's verdict was tainted[71] by consideration of a theory of recovery that should properly have been withheld from it, we must order a retrial rather than reinstate the jury verdict. The case is therefore

*Reversed and remanded.*

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

I concur in the majority opinion insofar as it affirms the judgment of the district court but dissent from the ordered retrial of the case on the claim that the guard, in being on the porch after he announced his count, might be sufficiently negligent to constitute the proximate cause of the assault upon appellant by fellow inmates. Assault on inmates was not part of the risk that the procedure implementing the Count System[1] was designed to protect against.

The majority opinion holds that the District of Columbia might be responsible for an assault upon one inmate by others at Lorton Reformatory because an "officer ... went out on the porch after calling in the [prisoner] count [thereby] violat[ing] his duty [under the "Count System"] to stay inside the dormitory and assure that inmates also stayed on their wings" during

the count. Maj. op. at 647. According to appellant's theory "each officer should have been patrolling one wing of the dormitory *to ensure that no inmate left his wing during the count." Id.* (emphasis added).

However, as the majority opinion recognizes, *id.* at 646, the object of the counting procedure, upon which appellant bases his claim of negligence, was to obtain an accurate count of inmates. This objective was not in any way related to protecting inmates from assaults by other inmates. Thus, in my opinion, the district court properly granted judgment in favor of the District.

Even if it is assumed that the officer for a few moments was not positioned at the most advantageous location to implement the "Count System," he did not thereby breach any duty *to the plaintiff* that the "Count System" placed upon him. Whether the count was correct or not, and there is no showing that it was incorrect, the procedures for obtaining an accurate count were not directed at protecting plaintiff or other inmates from inmate assaults. Such facts created an issue of law for the court, which properly held that the negligence allegedly resulting from the claimed violation of the Count System was not the proximate cause of plaintiff's assault by a number of inmates which included one inmate from another wing.[2]

Professor Prosser noted in an article which was a forerunner to his famous treatise on Torts:

It would appear that a consideration of "proximate cause" must necessarily involve:

testimony that the officer in question was not on his "side" at all relevant times.

---

**71.** The trial judge stressed the interconnection of the three theories as presented by the appellee for the jury's consideration:

I think the jury has a right to consider the inferences that can be drawn from each theory, individually and in concert. I do not think it can be broken up as you suggest. Tr. 5/9/79 at 438–39.

**1.** The "Count System" was set forth in the "Resident [Inmate] Handbook." It imposed duties primarily on inmates, and did not require the guards to be at any particular place. Under the practice one officer counted the "B and D side" and the other officer counted the "A and C side." Tr. 5/7/79 at 104. There was no

**2.** Whether the controlling issue is viewed as duty or proximate cause, the important point is that the district court recognized the issue as a legal one for the court to decide. *See generally* Thode, *Tort Analysis: Duty-Risk v. Proximate Cause and the Rational Allocation of Functions Between Judge and Jury,* 1977 Utah L.Rev. 1 (advocating the duty-risk analysis to ensure that the issues of policy are decided by the court and not by the jury in a misguided application of proximate cause).

(1) The problem of the fact of causation.

(2) The problem of responsibility for events which could not reasonably be foreseen or anticipated.

(3) The problem of liability to persons to whom no harm could reasonably be anticipated.

(4) The problem of intervening forces.

(5) The problem of the amount of damages.

(6) The problem of shifting responsibility to others.

The list is by no means exclusive, and "proximate cause" has been used in connection with many other issues. . . .

Prosser, *The Minnesota Court on Proximate Cause*, 21 Minn.L.Rev. 19, 21 (1937). Prosser points to several cases in support of the rule that proximate cause is lacking "where harm results from a violation of a statute . . . which was not designed to afford the plaintiff any protection." W. Prosser, Law of Torts 245 n.70 (4th ed. 1971).[3] In *Philadelphia, Wilmington & Baltimore Railroad v. Philadelphia & Havre de Grace Steam Towboat Co.*, 64 U.S. (23 How.) 209, 16 L.Ed. 433 (1860), the Supreme Court held that the owners of a steamboat sailing on Sunday in violation of the Maryland Blue Law were not precluded by the doctrine of contributory negligence from collecting damages from the defendant who negligently left hidden obstructions (piles) in the waterway since *that statute* did not impose any duty *on the owner of the steamboat to the defendant.* "The laws relating to the observance of Sunday defines a duty of a citizen to the state, *and to the State only.*" 64 U.S. (23 How.) at 218 (emphasis added). *Accord, Tingle v. Chicago, B & Q Ry.*, 60 Iowa 333, 14 N.W. 320 (1882) (railroad which unlawfully operated its trains on Sunday in violation of the state's blue law, in the absence of other wrongdoing, was not liable for killing a cow at a crossing— the unlawful act consisted of operating its train at the place in question on Sunday and *that* "violation of a statute" was held

not to *proximately contribute* to the damage complained of). The opinion by Justice Hallam in *Armstead v. Lounsberry*, 129 Minn. 34, 151 N.W. 542 (1915), is to the same effect. Plaintiff, who was driving a car upon the public highway in violation of the state automobile registration law, was held not to be contributorily negligent

because he was at the time of the injury disobeying a statute law which in no way contributed to his injury. . . . The wrong on the part of plaintiff, which will preclude a recovery for an injury sustained by him, must be some act or conduct having the relation to that injury of a cause to the effect produced by it.

151 N.W. at 544. The Vermont Supreme Court in *Dervin v. Frenier*, 91 Vt. 398, 100 A. 760 (1917), held that it was error to charge a jury that it was evidence of negligence to operate an automobile *without a required operators license.*

[T]he violation of a statute is properly held to be evidence of negligence or even negligence per se . . . *only* when there is a proximate, causal connection between the violation of the statute and the injury complained of . . . .

100 A. at 761 (emphasis added). Finally, in *Falk v. Finkelman*, 268 Mass. 524, 168 N.E. 89 (1929), the defendant left his car on a city street in excess of the 20 minutes allowed by ordinance. While it was so parked it was struck by a fire engine that drove it into plaintiff, injuring him. The court held that

[d]efendant's violation of the ordinance was not an effective and contributing cause of the injury because it was not in accordance with the usual experience of mankind that the result of that violation of law ought to have been foreseen and apprehended . . . . The defendant [in exceeding the parking time limit] violated no legal duty owed the plaintiff. . . . Judgment for defendant.

168 N.E. at 90.

In the absence of expert testimony showing that the guards did not "act[] reason-

---

**3.** The same conclusion follows *a fortiori* when the harm allegedly results from the violation of an administrative regulation or procedure rather than a statute.

ably to secure the safety of [the] inmate," *Hughes v. District of Columbia*, No. 79–246 (D.C. Jan. 13, 1981), the district court *was required* to grant judgment n. o. v. for the District of Columbia. The majority opinion relies on the indefinite testimony of plaintiff's expert that the counting procedure "apparently" may not have been conducted on the day in question in accordance with the prevailing standard.[4] Since the counting was not intended to protect inmates against assault, expert testimony that it was not followed is insufficient to present a jury question. The majority opinion has pointed to no expert testimony which tends to show that the guards breached a duty of reasonable care to protect the inmates from harm, and in the absence of such testimony the district court properly took the case away from the jury.[5] Contrary to plaintiff's position on appeal, the issue of proximate cause is not solely a jury issue, since it

includes the non-causal question of whether the "defendant should be legally responsible." W. Prosser, Law of Torts 244 (4th ed. 1971). In this connection it cannot be said that it was in accordance with the usual experience of mankind that an inmate would be assaulted, as was Murphy, as the result of the officer being on the porch after he announced his count and that said result should have been foreseen and apprehended. *Falk v. Finkelman*, 268 Mass. 524, 168 N.E. 89 (1929).

The majority opinion also suggests that plaintiff submitted sufficient evidence to raise a jury question on the issue of tool control. This will no doubt come as some surprise to plaintiff, not to mention the District, since plaintiff did not argue in his brief on appeal that the district court erred in taking the case away from the jury on this issue.[6] For plaintiff to prevail on this

4. Tr. 5/8/79 at 250.

5. The majority contends that the guard's presence on the porch during the count facilitated a "cross-over" by one inmate from his wing to Murphy's. Since cross-overs are always prohibited, the majority suggests that the guard's alleged misplacement was "evidence of the institution's violation of its general duty to use reasonable care to protect inmates from assaults by other inmates." Maj. op. at 648 n.45. The District of Columbia conceded that "the unauthorized presence of an inmate on a wing other than his own at anytime violates Youth Center regulations separate and distinct from those pertaining to inmate counts." District of Columbia's Brief at 14. The majority's position must fail, however, because appellant's expert did not testify that the guard's position on the porch violated his duty to exercise reasonable care to prevent cross-overs. In response to the question, "What about the correctional officer being outside until the institutional count cleared?," he testified: "That would be highly ... irregular." Tr. 5/8/79 at 254.

 Clearly, the presence of an inmate on a wing other than his own indicates a violation of the regulation against wing-crossing. It does not, however, demonstrate negligence. As the District of Columbia argued: "[T]he mere occurrence of a fellow-inmate assault in violation of prison regulations does not *ipso facto* establish the jailer's negligence. If the law were otherwise, the jailer would be an insurer of inmate safety." District of Columbia's Brief at 14.

 The majority submits that the guard's presence on the porch necessarily resulted in the

breach of the institutional duty to stop crossovers because the guards were required to be in particular places during the count procedure. But, as the majority recognizes, the officer who went onto the porch did so only after the dormitory count had cleared—the actual counting in the dormitory had ended. This fact foils the majority's attempt to turn the guard's presence on the porch into an act of negligence based on a claim that the guard should have been elsewhere during the actual conduct of the count.

 Absent testimony that the guard's presence on the porch violated his duty to exercise reasonable care to prevent inmate cross-overs, appellant's case must fail on this theory. It is also worth noting that although appellant claimed he was attacked by four to six persons, only one of the two he identified, Pugh, lived in a different wing. Thus, even if the guards negligently permitted Pugh to enter Murphy's wing, Murphy's case might still fail in the absence of testimony indicating that Pugh's participation was essential to the attack.

6. The Statement of the Facts segment of Appellant's Brief includes a passing reference to the tool control and inventory procedures as the testimony of appellant's expert is recounted. In the Argument portion of the brief, however, appellant argues only that the count procedure evidence and the evidence that Pugh should not have been housed with the general prison population were sufficient to withstand a judgment n. o. v. This indicates appellant's view of the weight of his tool control argument, and led the District of Columbia reasonably to believe that Murphy had abandoned this aspect of his argument on appeal.

issue, it was his burden to prove that a breach of a standard regarding tool control was the proximate cause of his injury. The majority opinion is unable to point to the evidence by which plaintiff met this burden. Instead, it holds that the jury could infer negligence based on this theory because (1) the *District of Columbia* failed to establish that it maintained a proper tool inventory, and (2) there was evidence that the beating *may* have been administered with a blunt instrument, although no weapon was admitted into evidence. Appellant's abandonment of this argument is understandable; the majority makes his case for him only after placing the burden of establishing a sufficient tool inventory on the District and then ignoring the need for evidence connecting the allegedly inadequate tool control with the "instrument" that "may" have been used in the attack upon Murphy. In sum, the majority errs by considering an argument not argued by appellant on appeal, and by shifting the burden of proof from the plaintiff to the defendant and ignoring a glaring gap in the evidence.

All the reasons stated above illustrate the principle that the violation of any governmentally imposed rule of conduct that was not intended to protect the plaintiff against the harm he suffered cannot constitute the basis of a claim of negligence against any alleged violator. That principle applies to the instant Count System. It did not create any duty that the officer owed to Murphy sufficient for a violation thereof to constitute the probable cause of the assault upon him by another inmate. I therefore cannot agree with the reasoning or the result of the court's opinion and dissent therefrom.

Because I believe the district court properly granted judgment n. o. v. for the District of Columbia, I would affirm its judgment in all respects.