John DOE, et al.

v.

DISTRICT OF COLUMBIA, et al., Appellants.

No. 80–2171.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 23, 1981.

Opinion Jan. 11, 1983.

Separate Statements Jan. 28, 1983.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel and Michael Zielinski, Asst. Corp. Counsel, Washington, D.C., were on brief, for appellants. David P. Sutton, Asst. Corp. Counsel, Washington, D.C., also entered an appearance for appellants.

Peter J. Nickles, Washington, D.C., with whom Ellen Bass, Joseph M. Fisher and Charles E.M. Kolb, Washington, D.C., were on brief, for appellees.

For opinion of the Court, see 697 F.2d 1115.

The following are separate statements filed by MacKINNON and EDWARDS, Circuit Judges and ROBB, Senior Circuit Judge.

Separate Statement of MacKINNON, Circuit Judge:

For the reasons set forth in the opinion for the court, the judgment of the district court is vacated and the case remanded for a new trial. I am moved to point out, however, that I acquiesce in the court's decision only because defendants have not appealed from the district court's decision to deny their motion for judgment n.o.v. I harbor grave doubts whether plaintiffs have adduced sufficient evidence to support

a jury verdict. It is my hope that the district court will conduct the new trial with an eye to the concerns expressed below.

A *class* action brought by all the prisoners in the Maximum Security Complex (Maximum) at the District of Columbia Reformatory at Lorton, Virginia (Lorton) against the District of Columbia municipal and reformatory officials (officials) who administer the penal institution,[1] resulted in a judgment awarding money damages to the class and granting an injunction. Defendants were sued in their *official* capacities and the theory of plaintiffs' case required them to prove that the D.C. defendants were liable because of acts resulting from *official policy. Cf. Monell v. New York Department of Social Services,* 436 U.S. 658, 690–92, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). The jury award of damages and the court order of injunctive relief granted to the class of prisoners were (1) for the alleged *infliction* by the officials of "cruel and unusual punishment" (a *constitutional* tort)[2] by the District of Columbia officials responsible for the administration of Maximum and (2) for the alleged negligent failure of the defendant officials to provide adequate protection against inmate assault. Each of the six counts of the complaint is based on violence, i.e., the officials' "failure to provide adequate security and protection has caused plaintiffs to be exposed to pain and suffering by the constant risk and likelihood of *physical violence . . . .*" Amended Complaint ¶ 90, JA 33 (emphasis added). The class was certified as all prisoners inside Maximum and the "common questions of law and fact affecting the rights of inmates [was stated as the right] to be free from actual and threatened inmate *violence* and pervasive risk of harm." Amended Complaint ¶ 7, JA 15 (emphasis added). The D.C. and reformatory officials appeal the judgment on a variety of procedural bases and seek remand for a new trial.

---

1. Lorton Reformatory is administered by the city officials and employees of the District of Columbia, which operates under a home rule charter.

2. The Eighth Amendment prohibits the *infliction* of "cruel and unusual punishment."

Basically my review of the complete trial record left me unconvinced that the finding of a constitutional tort and negligence by the officials was supported by substantial evidence of sufficient magnitude to support a *class* action. It was also a matter of concern to me that damages in a substantial amount, over $500,000 excluding interest, were to be paid to the class, i.e., *all prisoners in Maximum.* The plaintiff prisoners, who claim to be *representative* of the class, are confined for the following offenses: Two for first degree murder; one for murder, kidnapping and armed robbery; two for second degree murder; one for second degree murder and bank robbery; one for manslaughter; six for armed robbery; one for armed robbery and attempted rape; one for assault with a dangerous weapon; and one for grand larceny. Amended Complaint ¶¶ 12–28, JA 16–18.

Judge Edwards' opinion for the court, at pages 953–956, points out the error in the court's instruction that led to the monetary award. It is also significant that the class included all the prisoners who were creating the conditions of which they complained. Appellants have correctly noted on the record that

> [p]laintiffs were ... both assailants and victims, weapon possessors, violators of security rules, men always ready to take advantage of one another by violent means and totally unwilling to share knowledge of weapons or assaults with prison personnel .... [3]

The prisoners demanded damages and injunctive relief from D.C. officials and prison administrators for alleged violence that they refused to report (Tr. 265, 280, 294, 297, 322, 338, 349, 375). More significantly, this case would represent the *first case in America* that diligent research could find where an award of money damages to a *class of prisoners* had been upheld. *Individual* prisoners had previously been awarded money damages for individual torts, but so far as I can find, money damages have never been paid to an entire *class of prisoners* despite several cases of very egregious prison conditions. And the evidentiary record here indicates that conditions at Lorton do not even approach the conditions that were present in cases like *Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970), *aff'd,* 442 F.2d 304 (8th Cir.1971), involving the Arkansas State Penitentiary System; *Gates v. Collier,* 501 F.2d 1291 (5th Cir.1974), involving the State Penitentiary at Parchman, Mississippi; or the Alabama prisons which were the subject of the decisions in *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd as modified sub nom. Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977), *rev'd in part sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam), where injunctions were issued to correct conditions in penitentiaries. It is incongruous to pay money damages to prisoners who are *causing* the violence and unhygienic conditions, who adhere to a code of silence, and who refuse to report violations or to cooperate (Tr. 287–89) in ameliorating the conditions about which they complain.

Typical of conditions in the prisons involved in the above cited cases, where complainants were limited to injunctive relief, were the conditions in the Arkansas State Penitentiary System. The Eighth Circuit decision found that prison to be fraught with cruel and unusual conditions, including, *inter alia,* the following: Ninety-nine percent of the security force at one of the prisons was comprised of so-called "trusty inmates" or "trusties"—privileged inmates who lorded over, abused, tortured, beat, and even occasionally murdered fellow inmates under their charge. *Holt v. Sarver, supra,* 309 F.Supp. at 373–76. With respect to the "trusty" system, the court noted that "just about every abuse which the system is capable of producing has been produced and is being practiced in this State." *Id.* at 374.

---

**3.** Memorandum of Points and Authorities in Support of Motion of Defendants for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial and Rehearing or, in the Alternative, for Remittitur; R. 187 at 8. The statement in the text describes the plaintiffs who would be the beneficiaries of the monetary award provided for by the jury verdict and the judgment of the District Court.

Because of the lack of qualified inmate supervision—one facility housing 1,000 inmates had *eight* noninmate guards—violence among inmates went completely unchecked. This was particularly true in the "open barrack" dormitories, where upwards of 100 inmates per barrack were assigned "without regard to anything but rank and race." *Id.* at 376. Stabbings in the dead of night by "crawlers" and "creepers"[4] were commonplace and often condoned by the "trusties" themselves, who were often " 'in league with the assailants.' " *Id.* (quoting *Holt v. Sarver (Holt I),* 300 F.Supp. 825, 830 (E.D.Ark.1969)). Gang rapes were frequent, often with "trusties" "look[ing] on with indifference or satisfaction." *Id.* at 377. Of this barrack-style confinement, the court said, in sum:

> Sexual assaults, fights, and stabbings in the barracks put some inmates in such fear that it is not unusual for them to come to the front of the barracks and cling to the bars all night. That practice, which is of doubtful value is called "coming to the bars" or "grabbing the bars." Clearly, a man who has clung to the bars all night is in poor condition to work the next day.

*Id.* Isolation cells were "overcrowded, filthy, and unsanitary." *Id.* at 378. Inmates in isolation were given unsuitable food and were forced to live among rats. *Id.* For the inmates in general, there was no rehabilitation program of any kind. *Id.* at 378–79. Medical and dental care was subpar and largely unavailable. *Id.* at 380. Sanitary conditions in the kitchen were "deplorable." *Id.* In sum, these conditions exhibited "a dark and evil world," *id.* at 381, far beyond the constitutional pale. "However constitutionally tolerable the Arkansas system may have been in former years, it simply will not do today as the Twentieth Century goes into [its] eighth decade." *Id.* at 381.

Other cases finding prison conditions unconstitutional address a concatenation of factors similar to those condemned in *Holt, Gates,* and *Pugh.*[5] Usually, a substantial number of deplorable factors coalesce in prisons where a constitutional violation has been found. Where—as here—only a single factor is alleged—violence—it must be so pervasive as to constitute a systemic infliction, particularly in a class action. It is elementary that a judgment in a class action must be based on proof of harm to the class. In the present case, there is insufficient evidence viewed in the light most favorable to the verdict from which a *reasonable* juror could infer that the *official policies* of the defendants caused a systematic exposure of the class to an unreasonable risk of physical harm.

Judge Edwards' separate statement expends its first nine pages misconstruing the foregoing paragraph, thereby setting up a straw man who would impose a "strong presumption that prisoners must show that they have been brutalized by *not one* but a '*substantial number*' of inhumane condi-

---

4. "Creepers" and "crawlers" are inmates who slither across dormitory floors to attack sleeping "enemies" in other parts of the dormitory.

5. *See, e.g., Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.), *amended in part and vacated in part,* 688 F.2d 266 (5th Cir.1982) (overcrowding, understaffing, classification, sanitation, medical care, physical safety, isolation and segregation, rehabilitation); *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980) (shelter, sanitation, food, overcrowding, inmate safety, understaffing, health and psychiatric care), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Williams v. Edwards,* 547 F.2d 1206 (5th Cir.1977) (violence (270 stabbings, 20 deaths in three years), overcrowding, understaffing, fire and safety hazards, health care, sanitation); *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977), *remand-* ed, 599 F.2d 17 (1st Cir.1979) (sanitation, lights, heating, ventilation, noise, idleness, fear and violence, absence or inadequacy of programs of classification, education, recreation, and vocational training). *See also Villanueva v. George,* 659 F.2d 851, 854 (8th Cir.1981) (en banc) (pretrial detainee) ("[Our decision] is ... based upon the totality of the circumstances ...."); *Madyun v. Thompson,* 657 F.2d 868, 874 (7th Cir.1981) ("We are aware that the essence of an Eighth Amendment violation consists of the *totality of the conditions* of confinement." (emphasis added)); *Williams v. Edwards, supra,* 547 F.2d at 1211 (*"Totality of conditions violate Eighth Amendment."* (emphasis in original)); *Bono v. Saxbe,* 527 F.Supp. 1187, 1195 (S.D.Ill.1981); *Heitman v. Gabriel,* 524 F.Supp. 622, 625 (W.D.Mo.1981).

tions before they are entitled to relief under the Eighth Amendment," p. 960 (emphasis added). But my opinion states that "*a single factor*" may be sufficient, *supra* at 950; it does not require "a substantial number of inhumane conditions." So to assert is a gross misstatement.[6] A single systemic condition can support a class action.

Class actions, as discussed at pages 961 to 964 of my colleague's separate opinion, are designed to eliminate the necessity of bringing "a multiplicity of identical cases." But class actions were not intended or designed to reduce the standard of proof that one single case required or to substitute a large smoke screen of facts for concise proof of the basic elements required to prove the case alleged. That is practically what I see happening here in the failure of the plaintiffs to prove, *inter alia,* that any official conduct proximately caused even one of them the harm they allege. This is in addition to their failure to prove understaffing, excessive violence or overcrowding. *See* discussion, *infra.*

## I. VIOLENCE

The Maximum prisoners complain of violence. However, this court and other courts have held that the existence of a number of assaults in a given prison is not *per se* "unreasonable" by common law negligence standards. *Murphy v. United States,* 653 F.2d 637 (D.C.Cir.1981). As we noted in *Murphy,* "[v]iolence is unfortunately endemic to American prisons .... [A prisoner, and here the class, must prove] ... that [the] numbers [of assaults in question] were *outside the range of violence normally associated with this type of penal institution,* or that any subset of prisoners suffered from an unusual risk of attack." *Id.* at 642 (emphasis added) (footnote omitted). Here plaintiffs were required to prove that the assaults clearly exceeded the range of violence normally associated with groups of *the most violence-prone felons.* Their evi-

dence, viewed most favorably, does not constitute such proof. My colleague asserts that this court is not adequately prepared to undertake a thorough examination of the evidence to support the jury verdict. That statement is erroneous. The court is not only adequately prepared to thoroughly review the evidence, but that is its duty. And as a result of such review I find it insufficient to support the verdict.

Prisoners in Maximum are confined together because, of all prisoners in the institution, they have demonstrated by their prior conduct, in or out of prison, that they present the *maximum* risk of violence or escape. "Prison setting is, at best, tense. It is sometimes explosive, and always potentially dangerous." *Marchesani v. McCune,* 531 F.2d 459, 462 (10th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 127, 50 L.Ed.2d 117 (1976). The existence of some violence in prisons is unavoidable, given the character of the prisoners society must place behind bars.

As Justice Powell noted in *Rhodes v. Chapman,* 452 U.S. 337, 351, 101 S.Ct. 2392, 2401, 69 L.Ed.2d 59 (1981) (emphasis added) (footnote omitted):

This Court must proceed cautiously in making an Eighth Amendment judgment because, unless we reverse it, "[a] decision that a given punishment is impermissible under the Eighth Amendment cannot be reversed short of a constitutional amendment," and thus "[r]evisions cannot be made in the light of further experience." *Gregg v. Georgia,* 428 U.S. [153] at 176 [96 S.Ct. 2909, 2926, 49 L.Ed.2d 859]. In assessing claims that conditions of confinement are cruel and unusual, *courts must bear in mind that their inquiries "spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." Bell v. Wolfish,* 441 U.S. [520] at 539 [99 S.Ct. 1861, 1874, 60 L.Ed.2d 447].[7]

---

6. Other misstatements I will merely leave to the judgment of the reader.

7. *See also Meachum v. Fano,* 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976) ("[F]ederal courts do not sit to supervise state

And jury expertise is even more wanting than judicial expertise. Justice Powell went on in *Rhodes* to quote *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) (footnote omitted):

> "[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism."

*Rhodes v. Chapman, supra,* 452 U.S. at 351 n. 16, 101 S.Ct. at 2401 n. 16.

Though Maximum does have some violence, the statistics offered by the prisoners at trial show an average of only fifteen assaults per year by inmates on other inmates from 1973 to 1980. JA 154–58. Such a low level of assaults does not support a claim of the infliction of cruel and unusual punishment upon plaintiffs under their own expert testimony, or under our decision in *Murphy,* which should control here—by virtue of its precedential value and its reasonableness. Comparative statistics were not introduced into evidence and so we are left to glean such statistics as we can from decided cases. First, the assaults in Maximum are very substantially lower than in *Holt, Pugh,* and the rest. In this case, while an average of fourteen (13.866) assaults per year by inmates on other inmates was reported for the seven-and-a-half year period from 1973 to July 1980,[8] only one death may have occurred, and the evidence is inconclusive that it occurred within the period covered by the complaint. (Tr. 348). No riots causing mass injury took place. There was no "trusty" system, with its attendant ill-effects, in operation. In *Murphy v. United States, supra,* which involved the Lorton Youth Center—housing about 560 decidedly less violent inmates—this court ruled that *twenty inmate assaults in the calendar year 1976, six of which occurred in a dormitory housing a hundred youths,* were *"not so high as to strike this court as per se unreasonable."* 653 F.2d at 642 n. 19 (emphasis added). In view of that precedent, with which my colleague fails to deal, I cannot conclude that an average of fourteen or fifteen assaults per year in the *maximum security* facility at issue in this case—which houses 400 inmates—is sufficient to support a finding that the number of assaults was unreasonable, excessive or indicative of insufficient protection. The nature of the population in Maximum alone would lead anyone to expect a greater risk of assault than would the population of the Youth Correction facility that was involved in *Murphy.* A comparison of the assault statistics for Lorton's Maximum with those in Lorton's Youth Correction complex is set

---

prisons . . . ."); *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) ("[T]he problems of prisons in America are complex and intractable, and . . . they are not readily susceptible of resolution by decree."); *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 859 (4th Cir.1975) (en banc) ("Because of this want of judicial expertise, 'prison officials must be accorded latitude in the administration of prison affairs,' [citing cases] and their judgments are entitled to 'great weight' [citing cases].").

**8.** That there were 14 assaults per year indicates that slightly less than 4 percent of the inmate population at Maximum were assaulted. By comparison, in *Miller v. Carson,* 563 F.2d 741, 745 (5th Cir.1977), some 27 percent of the inmates were assaulted in the year in question. If the assault record at Lorton for the last half of 1980 were assumed to continue at the same rate as during the first half of the year, the average per year would be increased to 15 (14.875) per year for the eight year period.

An average assault figure over the period represents the most reliable approach to evaluating conditions, since appellees are seeking damages over the period; damages could not be awarded for a period of time when violence was not allegedly unreasonable, i.e., before 1980, as my colleague's separate opinion would do. See p. 966 n. 30.

forth in the margin.[9] Since the gravamen of the prisoners' complaint is excessive violence, their proof does not support their complaint and their claim that the incidence of assaults was unreasonable cannot withstand our decision in *Murphy.*

On the issue of what amount of violence may reasonably be expected, it is also significant that Eugene Miller, the *plaintiffs'* own penological expert witness, testified that *twelve to twenty inmate assaults per year at Maximum was the expected range of such assaults.* JA 243–44. Thus, by plaintiffs' own standard, an average of fourteen or fifteen assaults per year, falling within that expected range and below that we found to be reasonable in *Murphy,* cannot be held to constitute sufficient evidence of the official infliction by defendants of cruel and *unusual* punishment on the *class.*

Prisoners with the most extreme records of violent propensities and violent crimes cannot expect that life in a *maximum security* prison, where their classification requires them to be housed, will be devoid of all violence. Such expectation is plainly unreasonable, except in an even more highly structured environment.[10] All that the prisoners had a right reasonably to demand was that violence not be *excessive.* Their own evidence demonstrates that it is not.

In Part II.C. of his separate statement, my colleague refers to some of the evidence of violence at Maximum. While these incidents are horrendous, the character of the violence does not exceed what one might expect in a maximum security prison, and the .total number of assaults, as discussed fully elsewhere, is not excessive. As Judge Merhige stated in *Penn v. Oliver,* 351 F.Supp. 1292, 1294 (E.D.Va.1972):

> It would be fantasy to believe that even the most enlightened prison officials operating with unlimited resources could prevent all acts of violence within the prison. Moreover, even if a prison official fails through his negligence to prevent an act of violence, a violation of constitutional right is not of necessity stated.

That case involved an individual complaint under 42 U.S.C. § 1983, and the principle is even more applicable to a class action case. My colleague's opinion naively ignores the wisdom expressed by Judge Merhige. It should also be pointed out that the prisoners' testimony on violence lacked specificity as to the parties involved and the dates. But the greatest defect in their testimony lies in the failure to establish a nexus between the unspecific assaults and the *official policies* of District officials—a failure to prove that official policy was the proximate cause of the harm complained of. While the testimony as to the assaults had the ring of truth for a prison such as Maximum, much of the testimony as to causation had a self-serving defect. On the general issue of the amount of violence and the staffing required, my colleague's separate opinion misstates my view by asserting it to be my opinion that "average conditions" will invariably pass constitutional muster. But that is *not* my stated opinion, which is,

---

**9.** Lorton's Maximum had a capacity of 400 and Lorton's Youth Correction Center, according to Department of Corrections data, had an average inmate population of 562 for the calendar year 1976. Annual Report at 22, 26. The statistics introduced by *plaintiffs* include the following comparative "Assault Information" for Youth Correction and Maximum for the fiscal years that overlapped calendar year 1976. Plaintiffs' Exhibit 573, JA 154:

*"Assault Information"*

*Resident on Resident and Resident on Staff*

| Fiscal Year | Youth Correction * | | | Maximum ** | | |
|---|---|---|---|---|---|---|
| | Resident on Resident | Resident on Staff | TOTAL | Resident on Resident | Resident on Staff | TOTAL |
| 1975 | 41 | 3 | 44 | 10 | 10 | 20 |
| 1976 | 26 | 6 | 32 | 14 | 4 | 18 |

* Average population for calendar year 1976, 565.
** Population, 400 maximum.

rather, that *conditions much better than average*—better, in fact, than those this court found reasonable in *Murphy* and which plaintiffs' expert witness did not find to be unreasonable—were insufficient to support a finding of a constitutional violation.

## II. STAFFING

The prisoners also contend that staffing was inadequate and was thereby a cause of violence. In my view the prisoners have not discharged their burden to prove by a preponderance of the evidence that staffing was inadequate. Understaffing has been discussed extensively in several cases. The national average of inmates to guards in United States prisons is 5 to 1. *Ruiz v. Estelle*, 503 F.Supp. 1265, 1290 (S.D.Texas 1980), *aff'd in part and rev'd in part*, 679 F.2d 1115 (5th Cir.), *amended in part and vacated in part*, 688 F.2d 266 (5th Cir.1982). Any figure appreciably above that ratio has been held contributory to cruel and unusual prison conditions. In *Ruiz v. Estelle, supra*, 679 F.2d at 1140, for example, the Fifth Circuit determined that Texas state prisons had an unacceptably high inmate-to-guard ratio of 12.45 to 1. In *Pugh v. Locke, supra*, 406 F.Supp. at 322, 325, the ratio was 9.3 to 1—still grossly inadequate.

At Lorton there were 122 guards at Maximum in charge of some 400 prisoners. JA 151. The inmate-to-guard ratio was thus 3.27 to 1. This is *much* better than the national average of 5 to 1, not to mention the ratios in *Ruiz* and *Pugh*. As a matter of law, therefore, such a ratio was not "woefully inadequate" or so "impermissibly high" as to constitute sufficient evidence that constitutional standards were violated. My colleague seeks to term this an argument for an "industry standard," with its well-known defect, but the Maximum figure is 34 percent better than what he would term the industry standard. And my colleague does not suggest any ratio he would find acceptable. His argument is totally lacking in specificity. Plaintiffs' evidence on understaffing, on which it bears the burden of proof, is obviously insufficient. Moreover, neither the prisoners nor my colleague have proven what the minimum standard is, and merely calling Maximum "understaffed" does not make it so.

Under D.C.Code § 24–442, the District of Columbia owes prisoners the identical duty of "reasonable care in the protection and safekeeping" owed them under principles of common law negligence. *Gaither v. District of Columbia*, 333 A.2d 57, 60 (D.C.App. 1975). Prison personnel are not, however, insurers of an inmate's safety. *Matthews v. District of Columbia*, 387 A.2d 731 (D.C. App.1978). Thus, the fact that an inmate is assaulted and sustains injuries does not, by itself, establish liability. *District of Columbia v. Davis*, 386 A.2d 1195, 1200 (D.C.App. 1978). "The [inmates] must establish by competent evidence a standard of care; that the defendant[s] violated that standard; and that such violation proximately caused injury to the [inmates]." *Hughes v. District of Columbia*, 425 A.2d 1299, 1302 (D.C.App.1981). The prisoners' evidence is insufficient to satisfy this standard.

The duty imposed on defendants requires "the exercise of ordinary diligence to keep prisoners safe and free from harm." *Jones v. United States*, 534 F.2d 53, 54 (5th Cir.), *cert. denied*, 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 586 (1976). Some antisocial behavior is to be expected in a prison environment; accordingly, the government is *not* an insurer of the safety of a prisoner, *id.; Fleishour v. United States*, 244 F.Supp. 762, 767–68 (N.D.Ill.1965), *aff'd*, 365 F.2d 126 (7th Cir.), *cert. denied*, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966), or here, of the class of all prisoners in Maximum. "The government's liability ultimately depends upon *whether the risks it took were reasonable or unreasonable.*" *Cowart v. United States*, 617 F.2d 112, 116 (5th Cir.) (emphasis added), *cert. denied*, 449 U.S. 903, 101

---

This indicates that the assault ratio in Maximum was even less favorable to plaintiffs' contentions.

10. The calculated risk implicit in present conditions is discussed *infra*.

S.Ct. 275, 66 L.Ed.2d 134 (1980).[11] To impose liability on the District and its officials also requires proof that their actions were the proximate and foreseeable cause of the alleged injuries. *Id.* As stated above, this necessary element of the case has not been proved.

Courts will not readily find negligence (or the official *infliction* of cruel and unusual punishment) from the presence of some risk, as is indicated by the so-called "calculated risks" test first articulated in *Fleishour.* There, the court recognized that it is the

standard practice in modern penal institutions to take calculated risks in various aspects of prison life, housing, work, recreation, religious worship and others, so that prisoners may learn to get along with other persons as part of the rehabilitation process. The result is, that from time to time, there occurs an episode such as that here involved in which the gamble is lost and another prisoner is injured.

244 F.Supp. at 767. *See also Williams v. United States, supra,* 384 F.Supp. at 584. Thus, in *Fleishour,* housing a number of inmates in one big room, a room in which there was a fire extinguisher on the wall, constituted a rehabilitative program that involved a calculated risk that excusably backfired. No finding of negligence was warranted—even in a case involving a single individual.

It is obvious from the record that the prison conditions here, to some extent, represent a calculated risk taken by preferring to allow more freedom rather than closer confinement. Were the officials negligent, or *inflicting* cruel and unusual punishment, in allowing the inmates at Maximum the freedom of movement that they enjoyed? If the result of allowing prisoners such freedom (with no overcrowding, a more than adequate staffing ratio of 3.27 to 1, and a not unacceptable prisoner assault average of fourteen or fifteen a year) were to be that District taxpayers must pay over a half a million dollars to the prisoners—many of whom cause the problems that

exist—the eventual solution would probably be to increase greatly restrictions on prisoners' freedom of movement by creating a more controlled environment. Locking prisoners in their cells for greater periods of time might be one solution. Also, their ability to associate with other prisoners might be substantially curtailed. Such practices might also impede rehabilitation. Would plaintiffs welcome a remedy that required them to be confined to their cells for more substantial periods of time, to have their freedom to associate with other prisoners more severely restricted, or to have their movements otherwise hobbled? If they prevail in their lawsuit, such may be the result.

Considering all the evidence, it is my view that the choices Lorton made were reasonable and were made in the prisoners' interests. The result has been uncrowded living conditions, commendable freedom and a not unacceptable incidence of assaults. Prison officials do *not* have the luxury of selecting their clientele. There will always be a danger of assaults when the most dangerous and violent criminals are confined in a single section of a prison facility, as they must be. But unless prisons lock up such prisoners in individual cells and greatly restrict their freedom of movement within the facility, as was once the practice, such institutions must be permitted to take calculated risks. In my view, the evidence here is insufficient to support a finding that the risks in Maximum exceeded what was reasonable or that the conditions at Lorton " 'involve[d] the unnecessary and wanton infliction of pain.' " *Rhodes v. Chapman, supra,* 452 U.S. at 346, 101 S.Ct. at 2398 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (Stewart, Powell, Stevens, JJ.)).

I also have some difficulty agreeing to a new trial. A new trial will *not change* the facts that average assaults were only fourteen or fifteen a year, that the staffing ratio was 3.27 to 1, or that 400 inmates in

11. *See generally,* Prosser, Law of Torts 146    (4th ed. 1971).

Maximum do not establish overcrowding. Under the theory of the plaintiffs' complaint, these *unchangeable facts* substantially undercut the principal basis for their claims that the *class* was harmed as a result of pervasive negligence or that cruel and unusual punishment was *officially inflicted* on the *class*. It thus appears to me that *unchangeable evidence* as to vital elements of plaintiffs' complaint *disproves* their claims. I also have considerable difficulty in supporting a conclusion that money damages can be awarded to a *class* of prisoners in mass that includes many prisoners who are causing the conditions complained of and will not cooperate to help correct them.[12]

I close with a summary statement regarding my colleague's separate opinion. He attacks what statistics are available, but substitutes nothing in their place. He exaggerates the violence, understates the staffing, misstates my opinion, and deems it proper to reward a *class* of inmates for causing violence whose alleged level is based substantially upon speculation on unreported assaults. The number of definite assaults that were actually recounted at trial does not add up to a constitutional violation; to hold that it does would trivialize constitutional violations. My colleague's reliance upon unreported assaults, and the assaults he assumes were committed after the period covered by the lawsuit, constitutes a tacit admission that the evidence of assaults in the record is insufficient to support the verdict.

However, as stated above, for reasons set forth in Judge Edwards' opinion for the court, I concur in vacating the judgment and remanding the case for a new trial.

As he indicates in his separate statement, Judge Robb shares the doubts expressed above that plaintiffs made a case in the District Court, but acquiesces in Judge Edwards' opinion for the Court.

Separate Statement of HARRY T. EDWARDS, Circuit Judge:

Though he concurs in the foregoing Opinion for the Court, Judge MacKinnon has written separately,[1] expressing his individual view that there may not have been adequate evidence presented at trial to support the verdicts rendered. Though, before the District Court, appellants routinely moved for judgment notwithstanding the verdict, they have not argued on appeal the question of the sufficiency of the evidence. In these circumstances, it seems to me not only unnecessary but unwise for this court to discuss the adequacy of the evidentiary foundation for the decisions reached below. My reluctance to engage in such an inquiry is overcome, however, by my sense of the importance of not allowing some of the statements in the Concurring Opinion to pass uncontested. I, therefore, offer my own separate statement in order to prevent the creation of any misimpressions regarding the content of the legal doctrines governing permissible conditions of incarceration and to dispel any doubts concerning the sufficiency of the evidence adduced below.

## I. PRISON CONDITIONS AS "CRUEL AND UNUSUAL PUNISHMENT"

In my view, the most serious misstatements of law in the Concurring Opinion concern standards of liability under the Eighth Amendment. Four aspects of its presentation of the constitutional doctrine are especially problematic: its explication of the "totality of the circumstances" test; its discussion of permissible levels of prison violence; its analysis of the effect on con-

---

12. A fact-finding committee scrutinizing Maximum in 1979 found problems with sanitation and hygiene that were attributable to the prisoners themselves. The committee recommended that "[a]ll inmates [should] be required to clean their cells on a daily basis subject to disciplinary action for noncompliance." JA 183. I cannot agree that such neglect of their own cells and the condition it creates constitute

official negligence or a constitutional tort for which the District of Columbia should be required to compensate the inmates. The Constitution does not require a prison to service inmates' cells.

1. For the sake of convenience, I will refer to my colleague's separate statement as the "Concurring Opinion."

stitutional norms of invocation of the class action procedure; and its assessment of the significance of "average" prison conditions in determining what constitutes "cruel and unusual punishment." These issues are discussed in order below.

### A. The "Totality of the Circumstances" Test

One of the principal arguments used by the Concurring Opinion to call into question the sufficiency of the evidence is that appellees' allegations of constitutional infringement were limited, for the most part, to one aspect or dimension of their incarceration. The Concurring Opinion insists that the inmates alleged only that they were exposed to excessive risk of assault and sexual abuse (caused or aggravated by various conditions), and that appellees failed to show or even assert that other conditions at Maximum—such as health care, food service and rehabilitative and recreational programs—fell below constitutional standards. The Concurring Opinion thus suggests that, because appellees' complaint was so narrowly focused, they were not entitled to relief unless they could show that conditions in the identified dimension were unusually brutal.

In advancing this argument, the Concurring Opinion intends to rely on a legal theory that has been adopted in many judicial opinions construing the Eighth Amendment—a theory frequently referred to as the "totality of the circumstances" test.[2] The suggestion in the Concurring Opinion that one must consider the "totality of the circumstances" at a given prison, by itself, surely is not objectionable. Rather, what is troublesome here is the apparent construction of the "totality of the circumstances" test offered in the Concurring Opinion—a construction that I find at odds with judicial precedent.

Hitherto, the "totality of the circumstances" test always has been used as shorthand for one or both of two insights. First, separate prison conditions that exacerbate one another must, of course, be considered together to determine whether their cumulative impact is sufficient to violate the ban on "cruel and unusual punishment." Thus, when a particular procedure or form of treatment, such as punitive or solitary confinement, is challenged, one must examine all of the constituent aspects of that form of incarceration to determine whether, in combination, they run afoul of the Constitution. Hutto v. Finney, 437 U.S. 678, 685–88, 98 S.Ct. 2565, 2570–72, 57 L.Ed.2d 522 (1978); Maxwell v. Mason, 668 F.2d 361, 363 & n. 8 (8th Cir.1981). The same principle applies when one is assessing the constitutional status of a prison as a whole. Insofar as "[t]he 'touchstone' of the Eighth Amendment inquiry is 'the effect upon the imprisoned,'" Rhodes v. Chapman, 452 U.S. 337, 366, 101 S.Ct. 2392, 2409, 69 L.Ed.2d 59 (1981) (Brennan, J., concurring) (quoting Laaman v. Helgemoe, 437 F.Supp. 269, 323 (D.N.H.1977)),[3] it is not sufficient to consider, seriatim, the influence on the prisoners of each of various arbitrarily designated dimensions of prison life (health care, food, inmate safety, etc.). Conditions in each of these areas "exist in combination; each affects the other; and taken together they [may] have a cumulative impact on the inmates . . . ." Holt v. Sarver, 309 F.Supp. 362, 373 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir.1971). "Even if no single condition of confinement would be unconstitutional in itself, 'exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment.'" Rhodes v. Chapman, 452 U.S. at 363, 101 S.Ct. at 2407 (Brennan, J., concurring) (quoting Laaman v. Helgemoe, 437 F.Supp. at 322–23).[4]

---

**2.** See, e.g., Clay v. Miller, 626 F.2d 345, 347 (4th Cir.1980) (per curiam).

**3.** Cf. Carey v. Piphus, 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978) (reaffirming the principle that the purpose of constitutional tort actions is "to compensate persons for injuries caused by the deprivation of consti-

tutional rights") (discussed in the Opinion for the Court, Part IV.).

**4.** See also Smith v. Sullivan, 553 F.2d 373, 378 (5th Cir.1977); Williams v. Edwards, 547 F.2d 1206, 1211, 1219 (5th Cir.1977). But see Hoptowit v. Ray, 682 F.2d 1237, 1246–47 (9th Cir. 1982); Wright v. Rushen, 642 F.2d 1129, 1132–

The second insight embodied in the "totality of the circumstances" test consists of a recognition of the unusual structure and purpose of most suits challenging terms of incarceration on the basis of the Eighth Amendment. Such controversies belong to a special category of litigation that has been denominated "complex enforcement." [5] Among the atypical features of suits of this sort, two are relevant in the present context. First, the wrong attacked is not a single, discrete transgression on the part of the defendant, but a system of related behavior, a "practice" engaged in over time by an entire institution.[6] Second, the willingness (on the part of both plaintiff and court) to mount such a systemic attack reflects a "transformative vision," a conviction that the real source of illegality is the organization of the institution in question, not the delicts of its individual officials, and that the law can and should dig deep in and, if necessary, substantially reorder that institution to ensure that its conduct is consistent with the society's fundamental norms.[7] As applied to Eighth Amendment suits, both of these features imply that the attention of the parties and the adjudicator ought to be directed at the structure and conduct of the prison as a whole, not at separate facets or conditions.[8]

To the extent that my colleague means to refer to these two insights, his invocation of the "totality of the circumstances" test is unexceptionable. But the manner in which the Concurring Opinion distinguishes the instant action from some prior cases involving broader spectra of constitutional violations suggests that more may be intended. It would appear from the Concurring Opinion that attention to the "totality of the circumstances" implies that a prison must be rife with brutality before constitutional barriers are breached. It is thus argued that one or a few "deplorable factors" rarely will be enough; inmates usually must demonstrate "a substantial number" of outrageous conditions before they can get relief.[9] Neither of the two insights discussed above lends any support to this suggestion. That two or more conditions may exacerbate one another does not mean that a single condition, if serious enough, cannot violate the Eighth Amendment. And that an adjudicator often must enlarge his field of vision to include all aspects of an institution's structure and behavior does not imply that he must be blind to one vicious or degrading practice.

In my view, the test proposed in the Concurring Opinion is also inconsistent with

33 (9th Cir.1981) (both holding that the conditions in the various dimensions of prison life must be evaluated independently). Without approving of the holdings of *Hoptowit* and *Wright,* it is worth noting that they are incompatible with my colleague's conclusion that the coalescence of "a substantial number of deplorable factors" is necessary to give rise to cruel and unusual punishment.

**5.** *See* Note, *Complex Enforcement: Unconstitutional Prison Conditions,* 94 Harv.L.Rev. 626, 626 (1981); L. Sargentich, Complex Enforcement (March 1978) (unpublished manuscript) (on file at the Harvard Law School Library). Other studies of this special kind of litigation include Chayes, *The Role of the Judge in Public Law Litigation,* 89 Harv.L.Rev. 1281 (1976); Eisenberg & Yeazell, *The Ordinary and the Extraordinary in Institutional Litigation,* 93 Harv.L. Rev. 465 (1980).

**6.** Sargentich, *supra* note 5, at 9–22.

**7.** *Id.* at 77–85.

**8.** Only relatively recently has the Eighth Amendment begun to be used in this systemic way. Before the 1960s, it was principally used to evaluate individual, judicially-imposed sentences. *See* Note, *Creatures, Persons, and Prisoners: Evaluating Prison Conditions Under the Eighth Amendment,* 55 S.Cal.L.Rev. 1099, 1101–02 (1982). The modern usage of the provision, however, is now firmly established and has received the imprimatur of the Supreme Court. *See Rhodes v. Chapman,* 452 U.S. at 345–47, 101 S.Ct. at 2398–99.

**9.** In fairness, I would note that, at a few points, the Concurring Opinion appears to concede that "a single factor" might give rise to a constitutional violation—at least if "so pervasive as to constitute a systemic infliction." To the extent that these concessions represent acknowledgments that the "totality of conditions" test does nothing more (and nothing less) than embody the two insights just described, I cease to quarrel with this aspect of my colleague's opinion. To the extent that the retreat is incomplete, my objection stands.

an enormous body of case law. The opinions are legion that indicate that unacceptable conditions in even one of the dimensions identified by the Concurring Opinion will run afoul of the Constitution.[10] Moreover, the courts in most of the cases that have involved "a substantial number of deplorable factors" have stated the rules thereby violated as *independent* constitutional requirements—making it clear that they were identifying and condemning a series of separate Eighth Amendment violations, any one of which alone would constitute "cruel and unusual punishment."[11] Finally, the standard advocated by the Concurring Opinion is inconsistent with the Supreme Court's recent analysis of Eighth Amendment doctrine. In *Rhodes v. Chapman,* the

Court reaffirmed the holdings of *Estelle v. Gamble* and *Hutto v. Finney,* that either the denial of medical care by itself or the kind of multifaceted inhumanity that characterized the Arkansas prisons would constitute "cruel and unusual punishment." 452 U.S. at 347, 101 S.Ct. at 2399. The Court then went on to say:

> Conditions other than those in *Gamble* and *Hutto, alone or in combination,* may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in *Gamble.*

*Id.* (emphasis added).[12]

The test elaborated in the Concurring Opinion appears especially implausible

---

**10.** *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976) (dicta) (medical care); *Maxwell v. Mason,* 668 F.2d at 363–65 (conditions in solitary confinement); *Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.) (threat of sexual assault from fellow inmates), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980); *Leonardo v. Moran,* 611 F.2d 397, 398–99 (1st Cir.1979) (dicta) (threat of violence from other inmates); *Burks v. Teasdale,* 603 F.2d 59, 62–63 (8th Cir.1979) (overcrowding); *Todaro v. Ward,* 565 F.2d 48, 52–53 (2d Cir.1977) (medical care); *Little v. Walker,* 552 F.2d 193, 197 (7th Cir. 1977) (exposure to violence and sexual abuse by other inmates), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978); *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir.1973) (per curiam) (threat of violence and sexual assault from other inmates); *Stewart v. Rhodes,* 473 F.Supp. 1185, 1193 (S.D.Ohio, E.D.1979) (prolonged, punitive use of "four-way" physical restraints violates the Eighth Amendment [a holding unrelated to the court's additional finding that racial segregation of prisoners violates the Fourteenth Amendment] ), *appeal dismissed,* 661 F.2d 934 (6th Cir.1981); *Kish v. County of Milwaukee,* 48 F.R.D. 102, 103–04 (E.D.Wis.1969) (exposure to violence and sexual abuse by other inmates), *subsequent disposition aff'd,* 441 F.2d 901 (7th Cir.1971).

**11.** *See, e.g., Hoptowit v. Ray,* 682 F.2d at 1246–47, 1250, 1252–53, 1257–58, 1259; *Wright v. Rushen,* 642 F.2d at 1133 (dicta); *Campbell v. Cauthron,* 623 F.2d 503, 505–09 (8th Cir.1980); *Williams v. Edwards,* 547 F.2d at 1219 (after affirming the judgment of the trial court that "the totality of conditions" at the prison was unconstitutional, the court of appeals went on to hold that, by itself, "the level of medical care" at the prison "violated the eighth and

fourteenth amendments"); *Kirby v. Blackledge,* 530 F.2d 583, 587 (4th Cir.1976) (holding that "[t]he combination of conditions alleged by the prisoners ... have the cumulative effect of being cruel and unusual punishment.... Many of the circumstances taken alone reach the level of cruel and unusual punishment, such as the Chinese cell, inadequate exercise and medical treatment, inadequate heating and ventilation, and lack of access to the prison library."); *Finney v. Arkansas Bd. of Correction,* 505 F.2d 194, 200–09 (8th Cir.1974); *Gates v. Collier,* 501 F.2d 1291, 1301–10 (5th Cir.1974) (applying the cumulation theory to various factors affecting inmate safety but holding that plaintiffs had proved independent constitutional violations in the areas of hygiene, health care, solitary confinement, corporal punishment, and reliance upon "trusty" guards); *Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582, 594 (D.P.R.1976), *aff'd,* 551 F.2d 877 (1st Cir.1977). *But see Holt v. Sarver,* 309 F.Supp. at 373.

**12.** Justice Brennan, joined by Justice Blackmun in concurrence, laid more stress than did the majority on the need to consider the totality of prison conditions. 452 U.S. at 362–63, 101 S.Ct. at 2407. But he too recognized that a single circumstance of incarceration, inconsistent with contemporary standards of decency, would violate the Constitution. Thus he observed, "*[e]ven if,*" in a given case, "no single condition of confinement would be unconstitutional in itself," the combined effect of prison conditions may violate the Eighth Amendment—clearly leaving open the possibility that a single degrading circumstance might, by itself, amount to cruel and unusual punishment. *Id.* at 363, 101 S.Ct. at 2407 (emphasis added).

when applied to the facts of this case. Assuming, *arguendo,* that a poor diet or inadequate clothing, without more, cannot rise to the level of a constitutional violation, it is difficult to see how the same can be said of the prevalence of violence. Many members of the appellee class have been beaten, stabbed or raped.[13] The remainder live in constant fear of such assaults. Undoubtedly several will be physically or psychologically maimed when—and if—they leave the prison. The suggestion that, unless coupled with other forms of inhumanity, prolonged subjection to such harms and risks cannot constitute "cruel and unusual punishment" is impossible to fathom.

In short, the Concurring Opinion appears to seize upon the concept of the "totality of the circumstances," ignore its well-established meaning and legitimate foundations, and transform it into a strong presumption that prisoners must show that they have been brutalized by not one but "a substantial number" of inhumane conditions before they are entitled to relief under the Eighth Amendment. The only suggestions in the Concurring Opinion as to why such a drastic doctrinal reform might be warranted are the references to judicial language counseling caution and restraint when assessing prison conditions. Those admonitions, however, provide no support for the proposal advanced in the Concurring Opinion. While it is certainly true that federal courts must accord legislators and prison officials some latitude in designing and testing solutions "to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system," *Rhodes v. Chapman,* 452 U.S. at 352, 101 S.Ct. at 2402, it is equally true that the courts have a duty to protect the constitu-

tional rights of prisoners.[14] Every modern opinion in the field has affirmed as much. Thus, immediately following the language in *Rhodes* that the Concurring Opinion finds so telling, the Supreme Court makes it plain that:

> Courts certainly have a responsibility to scrutinize claims of cruel and unusual confinement, and conditions in a number of prisons, especially older ones, have justly been described as "deplorable" and "sordid." When conditions of confinement amount to cruel and unusual punishment, "federal courts will discharge their duty to protect constitutional rights."

452 U.S. at 352, 101 S.Ct. at 2401 (footnote and citations omitted).[15]

B. *Exposure to Violence as a Form of Punishment*

Possibly because of the weak underpinnings of its variant of the "totality of the circumstances" standard, the Concurring Opinion does not place all of its weight on that stanchion. The opinion goes on to sketch the state of the law regarding permissible levels of inmate violence under the Eighth Amendment. The thrust of the analysis appears to be that, even if we consider only the violence issue, the appellees have failed to show that they were exposed to a sufficiently serious risk of harm to satisfy the stringent requirements for making out a constitutional violation.

The Concurring Opinion does not purport to state any clear legal standard concerning how prevalent prison violence must be before the Constitution is offended. However, various comments in the opinion—regarding the "unavoidability" of frequent

---

13. *See* Part II.C. *infra.*

14. Indeed, the special place of prisoners in our society makes them more dependent on judicial protection than perhaps any other group. Few minorities are so "discrete and insular," so little able to defend their interests through participation in the political process, so vulnerable to oppression by an unsympathetic majority. Federal courts have a special responsibility to ensure that the members of such defenseless groups are not deprived of their constitutional

rights. *See United States v. Carolene Prods. Co.,* 304 U.S. 144, 153 n. 4, 58 S.Ct. 778, 784 n. 4, 82 L.Ed. 1234 (1938); J. ELY, DEMOCRACY AND DISTRUST 135–36, 145–70 (1980).

15. *See also Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979); *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–06, 40 L.Ed.2d 224 (1974); *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam).

assaults, the congenital viciousness of maximum-security inmates, and the legitimacy of prison officials taking "calculated risks" —give the general impression that nothing short of open warfare among the prisoners, countenanced by the guards and administrators, will state a claim under the Eighth Amendment.

To expose the fallacy inherent in this conception of the state of the law, one needs only to quote a few of the leading opinions in the field. The central norm in this area is that,

> [a] prisoner has a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief.

*Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir.1973) (per curiam) (citation omitted). *Accord Ramos v. Lamm,* 639 F.2d 559, 572 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980); *Little v. Walker,* 552 F.2d 193, 197 (7th Cir.1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978); *Doe v. Lally,* 467 F.Supp. 1339, 1348, 1354 (D.Md. 1979). Prison officials have a corresponding *duty* "to exercise reasonable care to prevent prisoners from intentionally inflicting harm or creating unreasonable risks of harm to other prisoners." *Withers v. Levine,* 615 F.2d at 161. *Accord Woodhous v. Virginia,* 487 F.2d at 890; *Doe v. Lally,* 467 F.Supp. at 1354. Or, as the Ninth Circuit has recently put it, "[p]rison officials have a duty to take reasonable steps to protect inmates from physical abuse." *Hoptowit v. Ray,* 682 F.2d 1237, 1250 (9th Cir.1982) (citation omitted).

The opinion of the Fourth Circuit in *Withers v. Levine* persuasively elaborates these general principles. The Court of Appeals was concerned that a phrase used in its prior decision in *Woodhous* to describe conditions at the prison in question [16] had been improperly construed as a statement of the threshold of liability. The court corrected the misinterpretation in the following terms:

> A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution. The defendants seized upon that explanatory phrase from *Woodhous* to contend that something approaching anarchy must be proven before a cause of action under *Woodhous* may be made out, but conditions need not deteriorate to that extent before the constitutional right to protection arises. It is enough that violence and sexual assaults occur on the idle tier at MHC with sufficient frequency that the younger prisoners, particularly those slightly built, are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures.

615 F.2d at 161.

In sum, the Concurring Opinion holds appellees to an unduly high standard of liability concerning impermissible levels of violence. To be entitled to relief under the Eighth Amendment, appellees need only have shown that violence and sexual assaults occurred at Maximum sufficiently often to induce prisoners reasonably to fear for their safety and to make the prison officials aware of the problem, and that those officials failed to take reasonable steps to protect the inmates.

## C. Constitutional Norms and Class Actions

The Concurring Opinion attempts to buttress its novel formulations of the applicable standards of liability by attributing unusual significance to the fact that the case at bar was brought as a class action. The

---

**16.** *See Woodhous v. Virginia,* 487 F.2d at 890 ("[C]onfinement in a prison where violence and terror reign is actionable.").

opinion is riddled with references to appellees' status as a "class" but at no point does it clearly indicate why this seemingly irrelevant circumstance is so important. Various hints in the opinion suggest an adherence to one or both of two theories. The first is plausible but is not germane; the second is indefensible.

At a few points, the Concurring Opinion appears to refer to the fact that class action suits in which plaintiffs seek monetary damages for the deprivation of their civil rights are sometimes conducted in two stages. In the first stage, the issue of the defendant's *liability* (*i.e.,* the question whether the defendant has breached some statutory or constitutional duty it owes to all members of the plaintiff class) is adjudicated. In the second stage, which ensues only if such liability is established, the *remedy* to be awarded each individual plaintiff is determined. This second phase of the suit often entails the submission and evaluation of additional evidence—relating, for example, to the question whether the defendant's misconduct was a "but-for" cause of the injury sustained by each claimant.[17] If this is the scenario envisioned by my colleague, I have no quarrel with it; [18] however, I fail to see its relevance to the question whether appellants breached their obligation not to subject appellees to cruel and unusual punishment. The fact that, under some conceivable procedure for processing the case, a finding of liability might be followed by the adducement of additional evidence pertaining to the relief to be granted *individual* prisoners is of no significance in the present context.

Other language in the Concurring Opinion seems to suggest not that class actions may be procedurally bifurcated in the fashion indicated, but that suits brought on behalf of a class should be subjected to more stringent substantive standards of liability than individual actions. This suggestion is unsupported and insupportable. The Concurring Opinion points to no case law or commentary adopting or advocating such an extraordinary theory. And no arguments, based on logic or policy, favor such a conception of the differences between the two forms of litigation.

Certainly the notion that individual and class actions are governed by different standards of liability makes no sense when applied to the facts of the case at bar. The heart of the appellees' claim is that they have been and continue to be exposed to a risk of rape, assault or murder—a risk serious enough to give rise to a constitutional violation. All prisoners at Maximum have been and still are exposed to the same danger; any one of them could have brought an individual action challenging the conditions of his confinement. The fact that the inmates have combined their efforts and, with the permission of the District Court, have presented their claims in the form of a class action has no conceivable bearing on the merits of their allegations.

Nor does the theory proposed in the Concurring Opinion find any support in the voluminous case law dealing with Eighth Amendment challenges to prison conditions. The courts' hitherto unquestioned belief that the standards of liability are the same in the two procedural contexts is manifested by the fact that they treat citations to opinions that involve class actions and citations to opinions that involve individual suits as interchangeable.[19] Indeed, for any

---

17. *See, e.g., Baxter v. Savannah Sugar Ref. Corp.,* 495 F.2d 437, 444–45 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974).

18. Indeed, the propriety of such a procedure was recently confirmed by this court. *See Milton v. Weinberger,* 696 F.2d 94, 99 (D.C.Cir. 1982) (dicta).

19. The single opinion that arguably might constitute an exception to this rule turns out, upon examination, to be ambiguous at best. In *Maxwell v. Mason,* 668 F.2d 361, 364–65 (8th Cir. 1981), the Eighth Circuit distinguished the decision of the Fifth Circuit in *Novak v. Beto,* 453 F.2d 661 (1971), *reh'g denied,* 456 F.2d 1303, *cert. denied,* 409 U.S. 968, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972), partly on the ground that "*Novak* was a class action in which the entire system of solitary confinement of the Texas Department of Corrections was challenged as unconstitutional." 668 F.2d at 365. But the court immediately thereafter made clear that its principal reason for discounting the rele-

significant point of law in this field, one can find comparable authority in class action cases and in cases brought by individuals.[20]

The argument suggested in the Concurring Opinion appears even more fragile when one takes into account the principles upon which class actions are founded. Scholars continue to disagree over the best way to explain and justify the binding effect of judgments in such cases on ignorant or involuntary class members and the tendency of the class action device to facilitate the initiation of certain kinds of suits;[21] however, all agree that the essence of the class action procedure is that "[i]t provides a means by which, where a large group of persons are interested in a matter, one or more may sue or be sued as representatives of the class without needing to join every member of the class."[22] In other words, a class action does not involve claims different in substance from those involved in an individual action. It is merely a mechanism for allowing a group of people, all of whom have suffered or are suffering the same wrong, to join together to seek redress.

This conclusion is reinforced by consideration of the status and function of FED.R. CIV.P. 23, the provision on which class actions brought in the federal courts are based. Both the origins of Rule 23 and its interpretation in other contexts indicate that successful invocation of the provision does not trigger a shift in the applicable substantive standards of liability. The Enabling Act, pursuant to which the rule was

promulgated, expressly provides that "[s]uch rules shall not abridge, enlarge or modify any substantive right ...." 28 U.S.C. § 2072 (1976). Moreover, it is settled that Rule 23 is sufficiently confined to questions of "procedure" to be applicable in diversity actions without transgressing the constitutional requirement that federal courts defer to state "substantive" law in such situations. *See* 7 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1758 (1972); *Briskin v. Glickman,* 267 F.Supp. 600, 603–05 (S.D.N.Y.1967).[23] In short, "Rule 23 is considered a procedural rule, rather than one that affects the substance or the merits of litigation." H. NEWBERG, CLASS ACTIONS § 2135 (1977) (footnote omitted).

Finally, consideration of the practical effect of the doctrine intimated in the Concurring Opinion makes its senselessness even more apparent. Were the proposed theory to be widely adopted, the prisoners in every future case, aware that they would be confronted with elevated standards of liability if they brought a class action, would likely instead bring a series of individual suits. The court would consequently be compelled to hear and evaluate a multiplicity of essential identical cases, rather than a single consolidated action. The resultant waste of time and energy is precisely what Rule 23 was designed to avoid.

In sum, the apparent suggestion in the Concurring Opinion that the appellees, because they brought their suit in the form of

---

vance of *Novak* was that the latter involved a situation in which prisoners kept in solitary confinement were provided with clothing and blankets whereas the prisoner in the case before it had been given only undershorts and a mattress. 668 F.2d at 365. At no point did the Eighth Circuit suggest that *Novak* was inapposite solely because it involved a class action rather than an individual suit.

**20.** Thus, for example, of the ten cases cited in note 10, *supra,* in support of the principle that unacceptable conditions in even one of the dimensions delineated by the majority violate the Constitution, four involved class actions and six involved individual suits. Similarly, of the eight cases cited in note 11, *supra,* in support of the proposition that courts addressing multifarious violations most often state the constitu-

tional norms thereby infringed as independent requirements, six involved class actions and two (at least at the stage of development at which they were being considered) involved individual suits.

**21.** *See* Note, *Developments in the Law—Class Actions,* 89 HARV.L.REV. 1318, 1337–43, 1348–72 (1976) (discussing the theories that currently seem most plausible).

**22.** C. WRIGHT, HANDBOOK OF THE LAW OF FEDERAL COURTS 345 (1976).

**23.** *Briskin* involved pendent, not diversity jurisdiction, but the court held that the same principles apply in the two contexts. 267 F.Supp. at 603.

a class action, must satisfy specially stringent standards of liability, is unprecedented and untenable.

### D. *National Prison Standards and "Cruel and Unusual Punishment"*

A significant portion of the hypothetical evaluation in the Concurring Opinion of appellees' evidence takes the form of comparative analysis. Thus, in assessing appellees' claim that the situation at the prison was aggravated by understaffing, the Concurring Opinion observes that the inmate-to-guard ratio at Maximum was better than the national average. In considering the prevalence of violence, the opinion stresses that assaults occurred less frequently at Maximum than at other prisons where Eighth Amendment violations have been found. Moreover, the opinion notes, the incidence of violence was within the range of figures that an expert witness had testified was to be "expected" in a prison like Maximum. The Concurring Opinion insists that these observations should be fatal to appellees' Eighth Amendment cause of action. Unless inmates can show that the conditions of their confinement are worse than average, it argues, they cannot make out a claim that they have been subjected to "cruel and *unusual* punishment."

When the Concurring Opinion applies this kind of comparative analysis to appellees' negligence claims, it falls into patent error. It has long been hornbook law that conformity to industry standards is insufficient to establish due care. As Judge Learned Hand once put it:

> Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never

may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission. *The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.) (citations omitted) (dicta), *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).[24]

The mode of analysis employed in the Concurring Opinion is equally inappropriate when applied to the Eighth Amendment. Whatever may have been the original meaning of the constitutional provision,[25] it is now well established that the ban on "cruel and unusual punishment" is defined with reference, not to prevailing penal practices, but to "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)). In determining whether a given condition violates the amendment, courts and juries are to look, not to circumstances common in other prisons, but to "the public attitude toward a given sanction." *Rhodes v. Chapman,* 452 U.S. at 349 n. 13, 101 S.Ct. at 2400 n. 13 (1981) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion)). The touchstone is "what the general public would consider decent." *Hoptowit v. Ray,* 682 F.2d at 1246 (citation omitted).

Although the public at large may at times close its eyes to the sad truth, it is undeniable that conditions in the nation's prisons often are extraordinarily brutal and degrading.[26] It would thus not be surprising if many aspects of current "industry standards" fell below "what the general public would consider decent." In any case, it is clearly erroneous to assume that "aver-

**24.** *See also Texas & P. Ry. Co. v. Behymer,* 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903); *Morrison v. Kansas City Coca-Cola Bottling Co.,* 175 Kan. 212, 263 P.2d 217, 224 (1953).

**25.** *See* Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning,* 57 CALIF.L.REV. 839 (1969).

**26.** *See generally Rhodes v. Chapman,* 452 U.S. at 354–56, 101 S.Ct. at 2403–04 (Brennan, J., concurring); NATIONAL ADVISORY COMMISSION ON CRIMINAL JUSTICE STANDARDS AND GOALS, CORRECTIONS (1973); Gettinger, *Accreditation On Trial,* CORRECTIONS MAG., Feb. 1982, at 7; Andersen, *What Are Prisons For?,* TIME, Sept. 13, 1982, at 38.

age" conditions will invariably pass constitutional muster.

## II. The Sufficiency of the Evidence

As I indicated at the outset, this court should not—indeed is not adequately prepared to—undertake a thorough examination of the sufficiency of the evidence to support the jury's verdict. The following section does not purport to conduct such a comprehensive review of the record. Its purpose is merely to highlight the most serious errors in the survey of the testimony attempted in the Concurring Opinion.

### A. The Standard of Review

The rule governing appellate review of the sufficiency of the evidence to support a jury verdict is both strict and well established. That standard requires that "the evidence, along with all inferences reasonably to be drawn therefrom, ... [be] viewed in the light most favorable to" the party in whose favor the verdict was rendered. *Alden v. Providence Hospital,* 382 F.2d 163, 165 (D.C.Cir.1967). Moreover, unless an appellate court can determine that "no reasonable man could reach a verdict in favor of" the prevailing party, the jury's verdict must be allowed to stand.[27]

Application of the foregoing standard of review to the facts of the instant case, even adopting the Concurring Opinion's inflated liability theories, yields only one conceivable conclusion: we would be required to uphold the verdict if the strength of its evidentiary foundation were an issue before us. The most that could be said in appellants' favor is that "reasonable men" might disagree

over the sufficiency of the evidence; it surely could not be concluded, however, that *"no* reasonable man could reach a verdict in favor of" appellees. Only by misconstruing statistical evidence and ignoring a plethora of incriminating testimonial evidence adduced below, is the Concurring Opinion able to suggest that the matter is even worthy of discussion.

### B. The Treatment of Statistical Evidence

Numerical evidence presented at trial, particularly that relating to levels of violence, is misused in the Concurring Opinion in three ways. First, the opinion contrasts, somewhat carelessly, the statistics relating to the incidence of assaults at Maximum with figures gathered at other institutions with only selective regard for the comparability of the respective reporting systems and prison populations. When a reference to comparability is advantageous, it is incorporated in the discussion. But when such favorable references are not available, the Concurring Opinion does not hesitate to evaluate violence statistics without any background information whatsoever.[28] This skewed treatment of the data only compounds the problems created by reliance upon such comparative analysis in the first place.[29]

Second, the Concurring Opinion makes much of the fact that the average incidence of reported assaults at Maximum is "only fifteen" per year. But the figure most relevant to the appellees' claims is not the *average* level of violence over the preceding seven and a half years, but the incidence of

---

**27.** *See, e.g., Muldrow v. Daly,* 329 F.2d 886, 888 (D.C.Cir.1964). Several hundred cases adopting the same test are cited in 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 50.02[1] nn. 20–21 (2d ed. 1982). The Concurring Opinion at a few points appears to suggest that the verdict should be overturned on appeal if it is not supported by "substantial evidence." To the extent that those suggestions are intended to dilute the stringent "reasonable man" standard, they find no support in the voluminous case law.

**28.** See, *e.g.,* the references to the incidence of "brutality" and "assault" in the Duval County Jail, Jacksonville, Florida. The Concurring Opinion fails to consider whether the reporting systems are comparable and whether the statistics in question include minor altercations. (The opinion from which the data is drawn, *Miller v. Carson,* 401 F.Supp. 835, 883 (M.D. Fla.1975), strongly suggests, at a minimum, that the figures relate to more than serious assaults, as the Concurring Opinion implies.)

**29.** Those difficulties are discussed in Part I.D. *supra.*

violence at the time of the suit.[30] When that statistic is extracted from the record, the situation is revealed to be much more serious than the Concurring Opinion would have us believe. In the preceding six months there had been fifteen reported assaults at Maximum—an average of thirty per year—and the level of violence had been steadily rising since 1978. App. 157–58, 176.

An even more serious problem concerns the value of the statistics in question, no matter how they are construed, in assessing conditions at the prison. As testimony at the trial makes evident, very few of the assaults and homosexual rapes committed at Maximum ever find their way into the record books. Fear of reprisal, desire not to be known as a "snitch" and, in the case of homosexual attacks, reluctance to identify oneself as an "easy mark" deter victims from reporting such incidents.[31] Under the circumstances, the fact that the prison has records of an inmate assault rate of "only" thirty per year proves little. Indeed, given the dynamics of the situation, it would seem likely that, as the level of violence and the danger of reprisal increase, the percentage of incidents reported would decrease, thus compounding the problem.

## C. *The Profusion of Testimonial Evidence*

The crucial factor, for the purpose of assessing the appellees' Eighth Amendment claim, is the seriousness of the risk of assault and sexual abuse to which they were exposed. Given the absence of reliable statistical indices of that risk, the trier of fact would have had to rely upon descriptions of the level of danger by inmates and prison officials. The record is replete with such testimony. Witness after witness described stabbings, beatings and fights. App. 264–65, 277, 294–97, 312, 315, 349, 359, 362. Several testified that they had observed homosexual rapes. App. 283, 286–87, 291–93, 338, 373. The more detailed accounts included descriptions of: a stabbing in the shower area, App. 274–75, 284–85, an attempted stabbing with a butcher knife, App. 251–52, beatings in the shower area, App. 280, cell burnings, App. 322–323, 363, an inmate "bleeding profusely from his stomach," App. 252, 271, an inmate thought to be a "snitch," picking himself up off the floor, bleeding from the mouth and nose, App. 266–69, a stabbed inmate bleeding from the chest, App. 339, and the death of an inmate resulting from seven or eight stab wounds near his heart, App. 348. To suggest that no reasonable man, presented with this evidence, could conclude that prisoners at Maximum were exposed to a pervasive risk of harm reflects both contempt for the judgment of the trier of fact[32] and callousness toward the appellees' plight.

## III. Conclusion

In light of the foregoing discussion, appellants' decision not to raise on appeal the

---

**30.** Certainly, for the purposes of determining the existence of a constitutional violation, the relevant variable is the incidence of violence at the time of the suit. The measure or scope of the remedy to which the inmates—individually or collectively—are entitled may well turn partially on other factors, such as fluctuations in the incidence of violence in the course of their periods of incarceration. But the latter question is not before us.

**31.** The affidavit of Deborah Jones, a correctional officer, dramatically illustrates this state of affairs:

I must emphasize that most inmate assaults go unreported because of the inmates' realistic fear of retaliation by other inmates. Burning of cells is an increasingly common form of retaliation. Understaffing prevents the correctional staff from effectively dealing

with this grave security problem. Indeed, just four weeks ago, a cell burning occurred in cellblock 2; the fire was so intense and the destruction so complete that the inmate's typewriter melted.

App. 178. *See also* App. 265–69, 321–23. The reluctance of prisoners to report incidents—even when under oath at trial—is evident from the testimony of Mr. Davenport. App. 286–93, 295–99. Similar conditions are documented in *Doe v. Lally,* 467 F.Supp. at 1348–49; *Withers v. Levine,* 449 F.Supp. 473, 475, 478 (D.Md. 1978), *aff'd,* 615 F.2d 158 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980).

**32.** The Concurring Opinion's disdain for the ability of the trier of fact to evaluate the evidence is further manifested by its reference to the paucity of "jury expertise."

question of the sufficiency of the evidence is readily understandable. When the evidence adduced below, viewed dispassionately and through the lens of the applicable standard of appellate review, is measured against well-established substantive standards of liability under the Eighth Amendment, it becomes clear that the jury's verdict is not vulnerable to reasoned criticism.

Separate Statement of ROBB, Senior Circuit Judge:

Although I share Judge MacKinnon's doubts that the plaintiffs made a case in the District Court, I acquiesce in Judge Edwards' opinion for the Court.